Argued and submitted July 2, 1986, Court of Appeals affirmed in part and reversed in part, trial court affirmed February 24, reconsideration denied March 31, 1987

## LEWIS,
*Respondent on Review,*

*v.*

## OREGON BEAUTY SUPPLY CO. et al,
*Petitioners on Review.*

(TC 8206-03404; CA A32019; SC S32697; SC S32703)

733 P2d 430

Duane Vergeer, Portland, argued the cause for petitioners on review Oregon Beauty Supply Company and Lawrence Stebbeds. With him on the brief was Thomas Sauberli, Portland.

Carol A. Hewitt, Portland, argued the cause and filed a brief for petitioner on review Scott Stebbeds. With her on the brief were Lloyd W. Weisensee, Barry L. Adamson and Williams, Frederickson, Stark, Norville & Weisensee, P.C., Portland.

Richard C. Baldwin, Portland, argued the cause for respondent on review. With her on the brief was Baldwin & Brischetto, Portland.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson and Jones, Justices.

CAMPBELL, J.

## CAMPBELL, J.

This case involves the torts of intentional infliction of severe emotional distress and intentional interference with an economic relationship. The case also involves three defendants: Oregon Beauty Supply Company (OBSC), Scott Stebbeds and his father, Lawrence Stebbeds. The relationship of each defendant to each claim raises independent issues.

There was evidence from which a jury could find the following facts: Plaintiff was employed by OBSC beginning in 1980. She initially handled shipping, packing and receiving and was subsequently promoted to a sales position. It was her responsibility to develop a telemarketing system in the Portland metropolitan area, and she was exclusively responsible for sales in that area. Plaintiff worked directly for Lawrence Stebbeds, the principal owner and manager of OBSC. Lawrence's son, Scott, supervised the OBSC warehouse where plaintiff's office was located.

In 1981 plaintiff and Scott Stebbeds began dating. When plaintiff decided that she wanted to see other men, Scott became jealous. On one occasion he became intoxicated and refused to allow her to leave a tavern; he followed her into her car, insisted on a ride home, and refused to leave the vehicle. Plaintiff asked several passers-by for assistance and a fight resulted between Scott and those individuals. Thereafter plaintiff refused to date Scott.

Scott reacted in a hostile manner. He exhibited his hostility towards plaintiff in the workplace. He "glared" at her from outside her office and told other employes that she had given him a venereal disease. He swore at her, called her a whore, searched her personal belongings and threw things at her. He refused to cooperate with her when she required information necessary to function in her job and would "fling" merchandise and paperwork into her office. On one occasion he intentionally slammed a door which hit plaintiff. He also told other employes that plaintiff would not be working at OBSC much longer.

Plaintiff responded by complaining to Lawrence Stebbeds. Lawrence said that he would talk to Scott. The harassment continued. Plaintiff complained to another supervisor, who attempted to speak with Scott without success. The

harassment continued, and plaintiff again went to Lawrence. Lawrence again said that he would speak to Scott, but that Scott would continue to work for OBSC and plaintiff could quit if she liked, although Lawrence encouraged her to stay. The harassment continued.

Approximately six months after the harassment began, plaintiff asked Lawrence for one month off in order to search for other employment. She asked Lawrence to keep Scott away from her during that time. Lawrence agreed that it would be best if plaintiff quit. She did so and subsequently filed these claims against Scott, Lawrence and OBSC.

At the close of plaintiff's case the trial judge granted directed verdicts in favor of OBSC and Lawrence Stebbeds on the intentional infliction of severe emotional distress claim.[1]

On the intentional interference with an economic relationship claim the judge granted OBSC a directed verdict. The jury returned a verdict against both individual defendants on that claim and awarded plaintiff general damages of $65,000. The jury also awarded $75,000 in punitive damages against Lawrence and $25,000 in punitive damages against Scott. The trial court subsequently granted Lawrence's motion for a judgment notwithstanding the verdict. A similar motion by Scott was denied.

Plaintiff appealed the judgment notwithstanding the verdict in favor of Lawrence on the interference claim and the directed verdicts granted to him and OBSC on the emotional distress claim. Defendant Scott Stebbeds cross-appealed the denial of his motion for judgment notwithstanding the verdict on the interference claim. He also argued that the award of punitive damages violated Article I, section 8, of the Oregon Constitution.

The Court of Appeals upheld the jury verdict and punitive damages award against Scott on the interference with an economic relationship claim and reinstated the jury verdict and punitive damages award against Lawrence on the same claim. The court affirmed the directed verdict on the interference claim with respect to OBSC. The court reversed

---

[1] The jury was instructed not to consider this claim against Scott if he was found liable on the interference claim. Plaintiff did not object to this instruction.

and remanded plaintiff's claims against Lawrence and OBSC for emotional distress. 77 Or App 663, 724 P2d 618 (1986). All three defendants filed petitions for review, which we allowed.

For the reasons stated herein, we affirm the trial court. The decision of the Court of Appeals is reversed in part and affirmed in part.

Because of the confusion involved in discussing three defendants and two independent claims, we will address one claim at a time. We will discuss the punitive damages issue last.

## A. Intentional Interference with an Economic Relationship

■ Before determining whether plaintiff has made out valid interference with economic relationship claims there is a preliminary issue to resolve. It involves the nature of an at-will employment contract. The general rule in this state is that employment contracts are terminable at will; this means that absent some contrary agreement an employer ordinarily may discharge an employe for any reason and at any time. *Patton v. J.C. Penney Co.,* 301 Or 117, 120, 719 P2d 854 (1986); *Simpson v. Western Graphics,* 293 Or 96, 99, 643 P2d 1276 (1982); *Swanson v. Van Duyn Choc. Shops,* 282 Or 491, 493, 579 P2d 239 (1978). The issue is whether an at-will employment contract can form the basis of an interference claim.

■ The very label of "contract terminable at will" assumes that the parties have a contractual relationship. What the label implies is that the durational element has been left open. Mallor, *Punitive Damages for Wrongful Discharge of At Will Employees,* 26 Wm & Mary L Rev 449, 453 (1985). This open-endedness should not affect the legitimacy of the agreement itself or the amount of protection available to the parties against interference by a third person. "The interest protected by the interference with contract action is the interest of the individual in the security and integrity of the contractual relations into which he has entered." *Wampler v. Palmerton,* 250 Or 65, 73, 439 P2d 601 (1968).

The parties to an at-will employment relationship have no less of an interest in the integrity and security of their contract than do any other contracting parties. We agree with

the statement that until such a contract is terminated "a contract is valid and subsisting, and the defendant may not properly interfere with it." Restatement (Second) of Torts § 766, *comment g* at 10-11 (1979); *see also* McCarthy, Punitive Damages In Wrongful Discharge Cases 258, § 4.10 (1985).

The tort of interference with an economic relationship has been recognized and developed by this court over the last two decades. In *Wampler v. Palmerton, supra,* we reviewed the historical lineage of claims for wrongful interference and set out the interests to be protected by that tort. *See also Straube v. Larson,* 287 Or 357, 600 P2d 371 (1979); *Top Service Body Shop v. Allstate Ins. Co.,* 283 Or 201, 582 P2d 1365 (1978). From these cases we derive the elements of a valid interference claim: "Either the pursuit of an improper objective of harming plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships may give rise to a tort claim for those injuries." 283 Or at 205. The question here is whether the facts as proved meet the elements of the tort.

### 1. *Defendant Scott Stebbeds*

In order to make out a claim for intentional interference with a contract plaintiff must show that Scott acted intentionally. *See Top Service Body Shop, Inc. v. Allstate Ins. Co., supra; Straube v. Larson, supra.* This intent standard is somewhat flexible:

> "* * * [E]ven if [a defendant] does not act for the purpose of interfering or does not desire it but knows that the interference is substantially certain to occur from his action and is a necessary consequence thereof, his interference is intentional as contemplated by the rule. Restatement (Second) of the Law of Torts § 766, comments (*h*) and (*j*)."

*Straube v. Larson, supra,* 287 Or at 361; *see also Wampler v. Palmerton, supra,* 250 Or at 73 (interference must be knowing and not inadvertent or merely incidental).

Scott's conduct comes within this definition. There was testimony that he told other employes that plaintiff would not be working for OBSC much longer. He also refused to cooperate with plaintiff when she required information in order to perform her job. In fact, plaintiff testified that Scott told her: "I don't have to work with you. You've dug your hole,

and you're out." Scott knew that he was interfering with plaintiff's job performance and therefore had the requisite knowledge that he was interfering with her employment relationship with OBSC.

Proof of an interference claim also requires that the interference either be in pursuit of an improper or wrongful motive or involve the use of an improper or wrongful means. *Top Service Body Shop v. Allstate Ins. Co., supra,* 283 Or at 205; *Straube v. Larson, supra,* 287 Or at 361 (plaintiff must show that defendant's conduct did not serve any legitimate purpose). These motives or means may be defined as improper "by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Top Service Body Shop v. Allstate Ins. Co., supra,* 283 Or at 209-10 (footnote omitted). They include such things as "violence, threats or other intimidation, * * * defamation, or disparaging falsehood." *Id.* at 210 n 11. However, it is unnecessary in making out an interference claim to prove all the elements of another tort. *Id.*

In this case Scott's conduct comes within several of these categories. He physically and verbally intimidated plaintiff. He also threatened her and defamed her to other employes. All these are improper means which in fact resulted in injury to plaintiff's employment relationship with OBSC.

Scott lastly argues that plaintiff's theory of recovery is precluded because his acts did not cause plaintiff to be discharged by the corporation; she chose instead to resign. Scott's distinction misses the mark. Discharge is not a necessary element of this tort.

■ The salient inquiry in any interference claim is whether defendant's tortious conduct damaged plaintiff's economic or contractual relationship. Defendant's interference may cause a third person to discontinue the relationship with plaintiff. Such was the case in *Top Service Body Shop v. Allstate Ins. Co., supra,* when defendant dissuaded insurance claimants from doing business with plaintiff. Alternatively, defendant's interference may render plaintiff incapable of continuing the relationship, as occurred in *Wampler v. Palmerton, supra.* There, defendant's refusal to provide plaintiff with promised financial backing caused plaintiff to breach

contracts with others. Plaintiff's contention here, that defendant's interference forced her to abandon her employment relationship with the corporation, is supported by the evidence and fully presents the elements of the tort.

## 2. Defendant Lawrence Stebbeds

Plaintiff's second amended complaint, further amended by interlineation at trial, alleged in part:

"Defendant Lawrence Stebbeds knew or should have known of defendant Scott Stebbeds' personal and wrongful motive in seeking plaintiff's termination prior to and on January 6, 1982, and acquiesced in defendant Scott Stebbeds' campaign to interfere with plaintiff's employment."

After plaintiff had rested her case-in-chief, Lawrence Stebbeds moved for a directed verdict claiming that there was a failure of proof. Plaintiff argued that Lawrence was responsible for the torts of Scott if Lawrence's conduct was negligent or reckless. The trial court in effect granted a partial directed verdict by ruling that there was no evidence of negligence or recklessness and later followed through by instructing the jury:

"In order that there can be acquiescence by Larry Stebbeds, * * * — the Defendant Larry Stebbeds must not only have been aware of the conduct of the other Defendant, that is Scott Stebbeds, toward Plaintiff, but he must have conducted himself in relation to the information in such a way that you find that Larry Stebbeds, in effect, became a participant in the campaign to interfere with the Plaintiff's employment by the Oregon Beauty Supply Company."[2]

Thus, Lawrence's knowledge about Scott's conduct and motives toward plaintiff becomes important. A reasonable jury could determine Lawrence's knowledge from: (1) direct testimony from witnesses as to what he saw or was told, and (2) inferences drawn from the facts established by that testimony.

Viewing the evidence in a light most favorable to the

---

[2] Plaintiff's only exception to this instruction was: "we take exception to use the word 'participation' in that instruction insofar as it suggests affirmative action."

plaintiff, the jury could have found the following: Scott's conduct against plaintiff covered a period of six months—commencing in early July 1981 and running through early January 1982. Scott's acts were divided into a course of conduct and specific acts. The course of conduct included repeated acts of glaring at plaintiff, acting disrespectfully and not cooperating with her. The specific acts although gross were not repeated. They included searching plaintiff's property and slamming a door on her.

Plaintiff testified that she talked to Lawrence about her problems with Scott on two different occasions—once within the first month.[3] She testified as follows:

"Q. Did you tell [Lawrence] what had happened at work?

"A. Yes. I was telling him what was — the glares were going on and what was happening, that Scott was treating me very disrespectfully, belligerent, wouldn't answer my questions.

"* * * * *

"Q. What was the next time after the time you discussed?

"A. Probably about three to four weeks after the first time.

"Q. And what did you tell him at that time?

"* * * * *

"A. I said: Larry, [Lawrence] would you get Scott off my back? I said: I can't work like this. And he said to me, he said —

"Q. Excuse me.

Did you provide him with any other information about what —

"A. Yeah, he knew what was going on. It was obvious.

"Q. But what did you tell Larry Stebbeds was going on at that time.

"A. The glaring, the staring. This was after — the first time I talked to him was before the incident with the empty polish bottles and Lucille. I talked to him before that incident. And

---

[3] Plaintiff also testified that she talked to Lawrence Stebbeds in early January 1982. The relevant part of her testimony is:

"* * * I went to [Lawrence's] office. I asked him if he would just give me a month. I would like to look for another job. But to please have Scott back down from me, to leave me alone."

then this was after that incident. And it kept pursuing. So I went to him again.

"Q. And what — did you tell him anything additional to what you just testified to?

"A. I told him at that time that — I asked him if he would get Scott off my back, that it was making my job very difficult, that I couldn't, you know, it was making me nervous. I was a nervous wreck."

■ The only witness, other than plaintiff, who testified as to Lawrence's knowledge was Orville Maynard. He was a sales person who worked at Oregon Beauty Supply at the same time as the plaintiff. He was called as a witness by plaintiff. Maynard testified that Scott threatened to "beat [plaintiff] up" but that Lawrence "put the squash on it immediately." He also testified that Lawrence was "caught in the middle" and "didn't know what to do."

There was no evidence that Lawrence personally saw or heard any of the acts or knew of the motives plaintiff alleged in her complaint.

A reasonable jury could not infer from the above testimony that Lawrence Stebbeds knew of the specific gross acts of conduct on the part of Scott. Without knowledge of those acts and the motive behind them, there is not sufficient evidence of intentional conduct necessary to sustain a verdict against Lawrence for interference with an economic relationship.

The trial court was correct in entering a judgment NOV in favor of Lawrence on the interference claim. Because there is no award of general damages against Lawrence, we do not reach the question of punitive damages against him.

### 3. Defendant OBSC

■ We uphold the lower courts' decisions that OBSC is not liable for tortious contract interference. OBSC, as a party to the contract, cannot be liable for interference with that contract. If the rule were otherwise, every discharge not otherwise "wrongful"[4] would become a potential contractual inter-

---

[4] See, e.g., Holien v. Sears, Roebuck and Co., 298 Or 76, 689 P2d 1292 (1984) (plaintiff's discharge for resisting sexual harassment held wrongful); Delaney v. Taco Time Int'l, 297 Or 10, 681 P2d 114 (1984) (plaintiff's discharge for failure to sign a false and defamatory statement about a former co-employe held wrongful); Nees v. Hocks, 272 Or 210, 536 P2d 512 (1975) (plaintiff's discharge for serving on a jury held wrongful).

ference claim. The Restatement (Second) of Torts §§ 766 to 766C, which we have cited in the past,[5] requires that defendant's alleged interference involve a relationship between plaintiff and a third party. *See also* McCarthy, *supra* at 259, § 4.11. We therefore agree with the Court of Appeals that OBSC cannot be liable, in its role as plaintiff's corporate employer, for interfering with the employment contract between itself and plaintiff.

### B. Intentional Infliction of Severe Emotional Distress

Plaintiff's so-called "Outrageous Conduct" claim is actually a claim for intentional infliction of severe emotional distress. *See Patton v. J.C. Penney Co., supra,* 301 Or at 119 n 1, for correct terminology. As to that claim the trial court granted both Lawrence and OBSC a directed verdict. The Court of Appeals reversed and remanded the claim for a new trial.

On review both Lawrence Stebbeds and Oregon Beauty Supply Co. assert that the remand was improper and that this court should not allow plaintiff to recover on both the interference claim and the emotional distress claim, based on the same facts and damages, because it would afford plaintiff a double recovery. We need not reach that question unless we first determine that the directed verdict was granted in error and the claim should have reached the jury. The directed verdict will be upheld only if there is no evidence to support plaintiff's position or if there is no conflicting testimony and the evidence is capable of only one construction. *City of Rogue River v. DeBoer,* 288 Or 485, 488, 605 P2d 697 (1980); *Archer v. Rogers Construction,* 252 Or 165, 169, 447 P2d 380 (1968).

To succeed on a claim for the intentional infliction of severe emotional distress plaintiff must show that (1) defendant intended to inflict severe emotional distress on plaintiff, (2) defendant's acts did in fact cause plaintiff to suffer severe emotional distress, and (3) defendant's acts consisted of "some extraordinary transgression of the bounds of socially tolerable conduct." *Patton v. J.C. Penney Co., supra,* 301 Or at 122; *Hall v. The May Dept. Stores,* 292 Or 131, 135, 637 P2d 126 (1981).

---

[5] *See, e.g., Straube v. Larson,* 287 Or 357, 361, 600 P2d 371 (1979); *Top Service Body Shop v. Allstate Ins. Co.,* 283 Or 201, 205-10, 582 P2d 1365 (1978).

We have held that a jury could find the elements of the tort where a landlord attempted to bully and frighten plaintiff out of an apartment by disconnecting utilities, using physical violence and threats of violence against plaintiff and her friends, and demolishing a portion of the building while plaintiff was still residing therein. *Brewer v. Erwin,* 287 Or 435, 600 P2d 398 (1979). *Turman v. Central Billing Bureau,* 279 Or 443, 568 P2d 1382 (1977), upheld a jury finding of liability where defendant employed abusive and threatening telephone calls in order to shame and frighten plaintiff into paying a medical bill, even after defendant knew that plaintiff had arranged a settlement with the creditor. *Hall v. The May Dept. Stores, supra,* affirmed a jury finding of liability where a store security officer deliberately, and in furtherance of his employer's objectives, used psychic distress as a tool to coerce an employe into admitting a crime when defendant knew that there was no proof of the employe's guilt.

In *Hall* we stated that the simple questioning of an employe, even combined with raised voices and accusations, would not be tortious. The tort was made out because the employe was subjected to distress "not as an incidental effect of an unpleasant confrontation, but intentionally as a cold-blooded tactic of interrogation upon scanty evidence." 292 Or at 141-42. (Footnote omitted.)

Lawrence's actions in this case, which involved tolerance of his son's misconduct, do not rise to the level of the cold-blooded oppressive browbeating of *Hall,* nor were the acts here as socially intolerable as those of the other cited cases. The facts of this case are closer to those in *Patton v. J.C. Penney, Co., supra.*

In *Patton,* one of defendant's supervisors terminated plaintiff's employment for unsatisfactory job performance. Plaintiff alleged that the termination was actually a result of plaintiff's refusal to break off a social relationship with a co-employe. The supervisor had instructed plaintiff to end the relationship and plaintiff had refused. The socializing did not appear to affect plaintiff's job performance, because during the same time period plaintiff earned awards for "Merchant of the Month" and "Merchant of the Year"; yet later that year the supervisor indicated dissatisfaction with plaintiff's work

and refused plaintiff's request for a transfer. Shortly thereafter plaintiff was discharged. We held that this manner of discharge was not as intolerable as the actions in *Hall v. The May Dept. Stores, supra; Turman v. Central Billing Bureau, supra;* and *Brewer v. Erwin, supra.* We agreed that defendant's behavior was " 'rude, boorish, tyrannical, churlish and mean - and those are its best points,' but that the allegations [did] not support plaintiff's claim for intentional infliction of severe emotional distress." *Patton,* 301 Or at 124 (citation omitted).

■ In this case Lawrence Stebbeds failed to respond to the problem, but we do not think that this is the type of behavior against which the tort was meant to protect.

> "* * *[T]he tort does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life even when the intentional conduct causing plaintiff's distress otherwise qualifies for liability. Similarly, insults, harsh or intimidating words, or rude behavior ordinarily do not result in liability or damages even when intended to cause distress." 292 Or at 135.

For the same reasons the corporation, acting through its agent Lawrence Stebbeds, is not liable for tortious conduct. We agree with the trial court on this issue and reverse the Court of Appeals.

## C. *Punitive Damages*

The jury also awarded punitive damages against Scott Stebbeds. Scott asserts, in his petition for review, that the award is invalid on two grounds. He first argues that the award unconstitutionally infringes on his right of free expression under Article I, section 8, of the Oregon Constitution.[6] He alternatively argues that if the award is constitutionally permissible the conduct in this case is not aggravated enough to support an award of punitive damages.

■ Defendant's constitutional argument is based on this court's opinions in *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979), and *Hall v. The May Dept. Stores, supra.* In *Wheeler* we

---

[6] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

developed the rule that punitive damages awards are prohibited in defamation cases. In construing together Article I, section 8, and Article I, section 10, we specifically held that:

> "* * * in a common-law civil action for damages, the defendant who has abused the right of free expression by defamatory statements may be held responsible only to the extent of permitting the injured party to recover for the resulting injury to reputation - that is, to recover compensatory damages." 286 Or at 118.

Our concern in *Wheeler* was with the relationships among the Article I, section 8, prohibition on "punishing" speech, either criminally or through punitive damages, the same clause's recognition of non-criminal liability for the abuse of speech, and the entitlement in Article I, section 10, to a civil "remedy" for "injury done" to, among other things, "reputation." In *Hall* we were confronted with intentionally caused harm, in that case emotional distress, brought about entirely by speech. We held that the limitation on punitive damages remained applicable "as long as [the injury] resulted from an 'abuse' of speech only." 292 Or at 146.

■ ■ Scott did not request an instruction that would have required the jury to separate expression from noncommunicative conduct in its determination of punitive damages. He considered all his acts privileged expression exempt from a punitive damages award. It is obvious, however, that some of his acts, such as searching plaintiff's property and intentionally slamming the door into her, are non-expressive conduct for which punitive damages could properly be awarded. Because Scott failed to ask for a punitive damages instruction limiting the jury's consideration to non-expressive conduct, we uphold the punitive damages award.

As to the claims against OBSC we affirm the Court of Appeals conclusion upholding the trial court's directed verdict on the interference claim. We reverse the Court of Appeals on the emotional distress claim.

As to the claims against Lawrence Stebbeds we reverse the Court of Appeals on the emotional distress claim and the interference claim. We do not reach the punitive damages claim against him.

As to the claims against Scott Stebbeds, we affirm the

Court of Appeals and the trial court which upheld liability on the interference claim and the punitive damages award.