Argued and submitted March 18, reversed in part; otherwise affirmed
November 25, 1998

Edward WHEELER,
*Respondent,*
*v.*
MARATHON PRINTING, INC.,
and Gary Wilkinson,
*Appellants.*
(9501-00698; CA A93256)
974 P2d 207

Robert M. Hildum argued the cause for appellants. With him on the briefs were Brian J. Sunderland, Ridgway K. Foley, Jr., and Greene & Markley.

Benjamin Rosenthal argued the cause for respondent. With him on the brief was B. Carlton Grew.

Before Haselton, Presiding Judge, and De Muniz* and Linder, Judges.

HASELTON, P. J.

---

* De Muniz, J., *vice* Wollheim, J.

## HASELTON, P. J.

Defendants Marathon Printing, Inc. (Marathon) and Gary Wilkinson, plaintiff's employer and coemployee, appeal. They assert, *inter alia,* that the trial court erred in denying their directed verdict motions against plaintiff's claims for unlawful discrimination on the basis of a mental disability, ORS 659.425, and intentional infliction of emotional distress, and in denying their motions to dismiss plaintiff's punitive damage allegations on those claims as being impermissibly based on expression. Or Const, Art I, § 8; *Wheeler v. Green,* 286 Or 99, 117-19, 593 P2d 777 (1979). We reverse the judgment against Marathon for intentional infliction of emotional distress, but otherwise affirm.

Viewing the evidence and reasonable inferences in the light most favorable to plaintiff,[1] the record discloses the following facts: Defendant Marathon is a printing company located in Portland, which specializes in printing numbered racing bibs for foot races. Marathon's owner, Ken Zirk, started the company in 1989 and, at that time, hired plaintiff as a press operator. From February 1989 to August 1993, plaintiff worked at Marathon under Zirk's supervision. During that time, plaintiff worked with defendant Wilkinson who was also a press operator. While employed at Marathon, plaintiff, who was valued because of his ability to operate two presses simultaneously, received annual merit-based raises and bonuses.

Marathon is a relatively small company, with fewer than 10 employees. The physical layout of the Marathon facility included a front office, the "shop" where plaintiff, Zirk, Wilkinson, and the other press operators worked, the shipping area which was adjacent to the shop, but separated by a partition, and the "prep" department—typesetting and

---

[1] As amplified below, defendants' assignments of error, with one exception, pertain to the sufficiency of plaintiff's proof. Thus, we review "the evidence in the light most favorable to the non-moving party * * * and extend to that party the benefit of every reasonable inference that may be drawn from the evidence." *Shockey v. City of Portland,* 313 Or 414, 422, 837 P2d 505 (1992), *cert den* 507 US 1017 (1993); *see Brown v. J.C. Penny Co.,* 297 Or 695, 688 P2d 811 (1984). The remaining assignment presents purely legal issues that do not require reference to the balance of the record.

camera—which was located on a separate floor. At all material times, plaintiff worked in the shop, operating two Chief 15 presses which were located side-by-side and adjacent to Wilkinson's workstation. Zirk also operated a Chief 15 press; however, his press was located across the shop and out of the line of vision from plaintiff's and Wilkinson's workstations.

In the fall of 1991, the work environment at the Marathon facility, and plaintiff's ability to perform his job in that environment, began deteriorating. That deterioration was precipitated by a comment by Wilkinson that if plaintiff would give him a "blow job," Wilkinson would "owe" him two. Wilkinson claimed that that comment was a joke. However, plaintiff, who had been sexually molested as a child and had sought counseling to aid him in dealing with issues of sexual orientation, did not understand it as a "joke." Instead, plaintiff was devastated by the comment and sought additional counseling.

Nonetheless, plaintiff and Wilkinson continued to work side-by-side. Wilkinson continued his harassment, calling plaintiff a "zit nose faggot" and "flipping him off" between four and 10 times a day for several months. Finally, in November 1992, plaintiff could not deal with Wilkinson's behavior any longer and asked Wilkinson not to speak to him and to leave him alone. A month later, when the harassment had not stopped, plaintiff told Zirk about Wilkinson's conduct and asked him to make Wilkinson stop. Zirk responded that plaintiff should "try to get along" with Wilkinson. Zirk did not speak to Wilkinson about the harassment at that time.

Wilkinson's harassment continued unabated. In January 1993, plaintiff's car was "keyed" while parked at work.[2] That same night, plaintiff's car was damaged by a brick while it was parked at his home. The next day, plaintiff's car again was "keyed" while parked at work, and plaintiff found a picture of a dog in the camera area which had his name written under it. Wilkinson knew plaintiff's car, knew where plaintiff lived, and had a work schedule similar to plaintiff's.

---

[2] "Keying" is scratching or defacing a vehicle with a key.

At the same time, plaintiff's mental health deteriorated: He broke down and cried when discussing work with family and friends; he lost considerable weight; and he was unable to sleep. On several occasions, plaintiff was unable to complete his shifts because of Wilkinson's harassment.

On February 4, 1993, plaintiff again asked Zirk to stop the harassment. Zirk responded that plaintiff needed to "work out" the problem with Wilkinson. Plaintiff replied that he would quit if the harassment did not stop, and Zirk simply told him to "put it in writing."

That night plaintiff attempted suicide. He did so, he later explained, because he could no longer cope with the harassment, because his work was everything to him, and because he believed Zirk had betrayed him through his nonresponsiveness.

While hospitalized following the suicide attempt, plaintiff was diagnosed with major depression and prescribed an antidepressant. Thereafter, plaintiff again sought counseling, and, despite his earlier threat to quit, returned to work four days after the suicide attempt. Plaintiff requested a workers' compensation claim form and informed Zirk that his attempted suicide was due to Wilkinson's harassment and that he was taking medication. Plaintiff also asked Zirk to make changes in the work environment to minimize plaintiff's contact with Wilkinson. Specifically, plaintiff suggested that: (1) his workstation—the two Chief 15 presses—be moved away from Wilkinson's workstation; or (2) he be moved to another job either in the upstairs "prep" department or in the shipping area; or (3) he and another coworker be allowed to work a graveyard shift. Zirk denied each of these requests with little explanation, except to indicate that plaintiff was too valuable on the presses to move to another position.

Zirk eventually discussed plaintiff's allegations with Wilkinson and told Wilkinson that if he did not stop, he would be fired. When Wilkinson denied any harassment, Zirk did not press the matter further.

Wilkinson was aware of plaintiff's suicide attempt. Indeed, he gave another coworker a note that stated that he

thought plaintiff needed "professional help." Nonetheless, and despite Zirk's warning, Wilkinson continued to harass plaintiff.

In April 1993, having no success in changing the conditions at work, plaintiff had his counselor, Wahlstrom, write to Zirk, expressing his concerns about the impact of the harassment and work environment on plaintiff's mental health. Although Zirk understood, or at least believed that plaintiff was, in fact, depressed and that plaintiff's work had deteriorated during the time plaintiff had complained of the harassment, he still did not act on plaintiff's requests to minimize his contact with Wilkinson.[3]

Instead, to exculpate himself, Zirk made a videotape, in which he referred to the letter he received from Wahlstrom as accusing him of "not tak[ing] any corrective action" against Wilkinson's harassment and then asked Wilkinson a series of questions about Wilkinson's alleged harassment. Wilkinson denied those allegations but, in so doing, referred to plaintiff as "mental," "delusional," "out of his mind," and "paranoid."

In the spring and summer of 1993, the harassment continued, with plaintiff and Wilkinson continuing to work side-by-side, and Wilkinson calling plaintiff a "zit nose faggot" and pointing to his nose with his middle finger several times a day. Finally, in August, plaintiff walked off of the job when Wilkinson called him "a crazy lunatic faggot" and Zirk again refused to do anything. Zirk was relieved that plaintiff walked off the job—he was "ready for him to go."

In January 1995, plaintiff brought this action against Marathon and Wilkinson. With respect to Marathon, plaintiff alleged claims for: (1) disability-related employment discrimination in violation of ORS 659.425, including specifications of "hostile work environment" and "failure to make reasonable accommodation"; (2) constructive discharge; and

---

[3] Although at trial Zirk and other current Marathon employees denied ever seeing any harassment, a former front office worker testified that he had heard Wilkinson refer to plaintiff as a "zit nose faggot" and saw him give plaintiff "the finger." Wilkinson also admitted that he, in fact, had given plaintiff "the finger" on numerous occasions, and that he had told plaintiff to "go throw up if he was sick."

(3) intentional infliction of emotional distress (IIED), including separate counts asserting direct and vicarious liability. With respect to Wilkinson, plaintiff asserted claims for IIED or, in the alternative, intentional interference with economic relations. Plaintiff sought punitive damages against both Marathon and Wilkinson.

The case was tried to a jury, which returned a special verdict. Because the substance of the special verdict is critical to a clear understanding of defendants' assignments of error and our treatment of those assignments, we reproduce the jury's responses *in toto*:

### "SPECIAL VERDICT

### "FIRST CLAIM FOR RELIEF - DISABILITY DISCRIMINATION

"1.   Is Marathon Printing, Inc. liable to Plaintiff under his first claim for relief which asserts disability discrimination for failing to accommodate a disability? <u>YES</u> (yes or no)

"2.   Is Marathon Printing, Inc. liable to Plaintiff under his first claim for relief which asserts disability discrimination for disability harassment that created a hostile working environment? <u>YES</u> (yes or no)

"3.   If your answer is yes to either 1 or 2 what is the amount of damages that plaintiff is entitled to recover? * * *

| "a. | 1. Non Economic Damages | $<u>2,000</u> |
| | (cannot exceed $200,000) | |
| | 2.   Medical Expenses | $<u>4,335.45</u> |
| | (cannot exceed $4,335.45) | |
| "b. | Punitive | $<u>25,000</u> |
| | (cannot exceed $200,000) | |

"* * * * *

"4.   If your answer to either 1 or 2 above is yes, did Marathon Printing, Inc. constructively discharge Plaintiff? <u>Yes</u> (yes or no)

"5.   If your answer to 4 is yes, what is the amount of damages that Plaintiff is entitled to recover from the constructive discharge?

"a.  Back Pay  $23,046.64

(cannot exceed $23,046.64)

"* * * * *

## "SECOND CLAIM FOR RELIEF - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

"6.  Is Marathon Printing, Inc. liable to Plaintiff for the second claim for relief which asserts intentional infliction of emotional distress for allowing Defendant Wilkinson's conduct? YES (yes or no)

"7.  If your answer to 6 is yes, what is the amount of damages that Plaintiff is entitled to recover from Marathon Printing, Inc. for this second claim?

"a.  Economic  $ -0-

(total damages awarded cannot exceed $27,246.64)
"b.  Non-Economic  $2,000

(total damages awarded cannot exceed $200,000)
"c.  Punitive  .  $13,600

(total damages awarded cannot exceed $200,000)

"* * * * *

"8.  Is Gary Wilkinson liable to Plaintiff for the second claim for relief which asserts intentional infliction of emotional distress? YES (yes or no)

"9.  If your answer to question 8 is yes, what is the amount of damages that Plaintiff is entitled to recover from Gary Wilkinson for this second claim for relief?

"a.  Economic  $ -0-

(total damages awarded cannot exceed $27,246.64)
"b.  Non-Economic  $ -0-

(total damages awarded cannot exceed $200,000)
"c.  Punitive  $7,500

(total damages awarded cannot exceed $200,000)

"* * * * *

"10.  Were the actions of Gary Wilkinson within the course and scope of his employment? YES (yes or no)

"11.  If your answer to question 8 and 10 are yes, what is the amount of damages that Plaintiff is entitled to recover

from Marathon Printing, Inc. for Gary Wilkinson's conduct under plaintiff's second claim for relief?

"a.        Economic                        $ -0-
(total damages awarded cannot exceed $27,246.64)
"b.        Non-Economic              $ -0-
(total damages awarded cannot exceed $200,000)
"c.        Punitive                       $ -0-
(total damages awarded cannot exceed $200,000)

"* * * * *

## "THIRD CLAIM FOR RELIEF - INTERFERENCE WITH ECONOMIC RELATIONSHIP

"12.   If your answer to 10 is no, is Gary Wilkinson liable to Plaintiff under his third claim for relief which asserts Intentional Interference with Economic Relations? N/A (yes or no)

"13.   If your answer to 12 is yes, what is the amount of damages that Plaintiff is entitled to recover from Gary Wilkinson for the third claim for relief which asserts intentional interference with economic relations?

"a.        Economic                        $ N/A

(total damages awarded cannot exceed $27,246.64)
"b.        Non-Economic              $ N/A

(total damages awarded cannot exceed $200,000)
"c.        Punitive                       $ N/A

(total damages awarded cannot exceed $200,000)
"* * * * *"

Defendants raise four assignments of error. The first three challenge the trial court's denial of defendants' directed verdict motions against plaintiff's statutory discrimination and IIED claims and the court's denial of defendants' motions to dismiss plaintiff's punitive damages allegations pertaining to those claims. Defendants' fourth assignment of error challenges the exclusion of a SAIF investigator's report, including statements by plaintiff pertaining to a workers' compensation claim that plaintiff filed after his attempted suicide. We have considered, and reject without further discussion, the

fourth assignment of error and proceed to the other three assignments.

## I. EMPLOYMENT DISCRIMINATION

Marathon first assigns error to the trial court's denial of its motions for directed verdict against both specifications of plaintiff's employment discrimination claim—*i.e.*, failure to make reasonable accommodations and hostile work environment. We discuss each in turn. With respect to the "reasonable accommodation" specification, Marathon raises two principal[4] arguments: First, plaintiff's mental impairment—major depression—was not a "disability" for purposes of ORS 659.425; second, ORS chapter 659 requires "intentional" discrimination, and plaintiff's evidence was insufficient to show discriminatory intent. Neither argument is availing.

ORS 659.425(1) (1989)[5] provides, in part:

"For the purposes of ORS 659.400 to 659.460, it is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to *discriminate in compensation or in terms, conditions or privileges of employment because*:

"(a) An individual has a physical or mental impairment which, *with reasonable accommodation by the employer, does not prevent the performance of the work involved;*

"(b) An individual has a record of a physical or mental impairment; or

---

[4] We have considered Marathon's other arguments pertaining to the "reasonable accommodation" specification and reject them without further discussion.

[5] The 1989 version of ORS 659.425, Or Laws 1989, ch 224, § 131, controls because that statute was in effect at all material times. In 1997, ORS 659.425(1) was significantly revised, Or Laws 1997, ch 854, § 13, and Oregon adopted new provisions relating to disability discrimination in employment under ORS 695.436 through ORS 659.449. Or Laws 1997, ch 854, §§ 2-11. The 1997 provisions specifically provide that they "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended." Or Laws 1997, ch 854, § 11.

The 1989 version of ORS 659.425(1), was adopted before the Americans with Disabilities Act and was modeled after the federal Rehabilitation Act of 1973, §§ 503 and 504, 29 USC §§ 793-794 (1973). *See OSCI v. Bureau of Labor and Industries*, 98 Or App 548, 553 n 6, 780 P2d 743, *rev den* 308 Or 660 (1989).

"(c)    An individual is regarded as having a physical or mental impairment." (Emphasis added.)

Marathon argues that the trial court erred in denying its motion for directed verdict because plaintiff failed to demonstrate that he qualified under the statute as "disabled" as defined by ORS 659.400 (1989).

ORS 659.400 (1989) included the following definitions:

"(1)    'Disabled person' means a person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment or is regarded as having such an impairment.

"(2)    As used in subsection (1) of this section:

"(a)    'Major life activity' includes, but is not limited to self-care, ambulation, communication, transportation, education, socialization, [and] employment * * *."

Marathon contends that plaintiff's diagnosis of major depression did not prevent him from performing the essential functions of the job because his condition was "transitory," in that it caused plaintiff to have only a few absences from work.

■    Marathon is wrong. Here, the record shows that plaintiff not only was diagnosed with major depression, the qualifying "mental impairment" for purposes of ORS 659.400, but also that as a result of that depression, he tried to kill himself, became socially withdrawn, lost a significant amount of weight, could not sleep, could not cope at work, and ultimately walked off the job because of the aggravation to his condition caused by the work environment. Those effects of plaintiff's major depression clearly demonstrate a substantial limitation on his "major life activities" under ORS 659.400(2)(a) (1989). *See Marconi v. Guardian Management Corp.*, 149 Or App 541, 548, 945 P2d 86 (1997) (the operative question is whether the plaintiff "demonstrated that [the disability] substantially limits one or more major life activities"). Plaintiff was, in short, disabled within the meaning of ORS 659.425(1) (1989).

Marathon next argues that ORS 659.425 required "intentional" discrimination and that plaintiff's evidence was

insufficient to show discriminatory intent. Marathon asserts that, to prevail on a "reasonable accommodation" specification, plaintiff must show that Marathon "intended to discriminate against him when it failed to accommodate his disability." No Oregon case has directly addressed whether a plaintiff who asserts a "reasonable accommodation" claim must prove an intent to discriminate—and we note that ORS 659.425 and its implementing regulations have been substantially amended since the material period here, 1991-93.[6] However, at least one case construing the then-applicable version of the statute, ORS 659.425 (1989), held generally that "the statute requires an act of discrimination accompanied by a discriminating intent." *Ammann v. Multnomah Athletic Club,* 141 Or App 546, 554, 919 P2d 504, *rev den* 324 Or 488 (1996). We need not resolve the proper role of intent in "reasonable accommodation" claims under the former version of the statute because we conclude that, even assuming the correctness of Marathon's formulation, plaintiff's proof was sufficient.

■ In particular on this record, the jury reasonably could determine that: (1) Plaintiff's mental impairment was either caused by, or continuously materially exacerbated by, Wilkinson's conduct. (2) Wilkinson acted "because of" plaintiff's mental condition. *See* 157 Or App at 302-03. (3) In engaging in the harassing activities, Wilkinson acted within the "course and scope" of employment;[7] thus, Wilkinson was acting, at least in part, to advance Marathon's interests. *See Chesterman v. Barmon,* 305 Or 439, 442, 753 P2d 404 (1988). (4) Zirk was aware that plaintiff was depressed and that, because of Wilkinson's conduct, plaintiff had attempted suicide. (5) Nonetheless, Zirk refused plaintiff's requests for accommodations to minimize his contact with Wilkinson. And (6) ultimately, Zirk admitted that he "was ready for

---

[6] As noted previously, ORS 659.425 (1989), was originally modeled after the Rehabilitation Act of 1973 but was significantly changed in 1997. At that time, the legislature enacted ORS 659.436 through ORS 659.449, Oregon's new Discrimination Against Disabled Persons in Employment Act. Those new provisions are modeled after the Americans with Disabilities Act of 1990 (ADA), 42 USC §§ 12101 *et seq.,* and contain language significantly similar to the ADA.

[7] The jury did, in fact, render an express finding to that effect. *See* Special Verdict Interrogatory No. 10, set out above. 157 Or App at 297. Marathon does not dispute that finding.

[plaintiff] to leave" the workplace and that he was relieved when plaintiff left. From that evidence, the jury could reasonably infer, and conclude, that Marathon, through Zirk, knew of plaintiff's disability and, in failing to reasonably accommodate that disability, intended to discriminate on the basis of that disability. Thus, we affirm the trial court's denial of the directed verdict motion against the "reasonable accommodation" specification.

Ordinarily, because the jury gave a single award of damages for both specifications of disability-related discrimination,[8] and there is no suggestion that distinct or different compensatory damages flow from the two specifications, our affirmance of the "reasonable accommodation" specification would be sufficient to sustain the award of damages and we would not consider the factual and legal sufficiency of the other, "hostile work environment" specification. *See Dynagraphics, Inc. v. U.S. National Bank of Oregon*, 100 Or App 108, 110, 785 P2d 760, *rev dismissed* 310 Or 120 (1990) (where the jury returns special interrogatories in a plaintiff's favor on two claims with identical or overlapping damages, "[a] proper verdict on either claim would independently support the judgment"). Here, however, that principle does not apply. The jury's award of punitive damages for employment discrimination could be based on either specification—or on both. Because "we can't tell" on which specification the jury based its award, *see Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 358-59, 788 P2d 428 (1990), we must address the sufficiency of the hostile work environment specification.

Again, Marathon raises two principal arguments.[9] First, Marathon contends that plaintiff was not "disabled." Second, Marathon asserts that plaintiff failed to prove his hostile work environment specification because he did not prove that Wilkinson's harassment was "because of" plaintiff's mental impairment. Because we have rejected the first argument, we proceed to the second.

Marathon argues, based on the "because" language of ORS 659.425(1) (1989), that

---

[8] *See* Special Verdict Interrogatory Nos. 1-3. 157 Or App at 296.

[9] Again, we reject Marathon's remaining arguments without comment.

"[p]laintiff's allegations demonstrate the lack of any causal connection between his alleged harassment and his putative disability. None of the conduct and none of the events he puts forth bear any logical connection to depression."

As we understand Marathon's argument, it is something to the effect that

"at best, plaintiff's evidence shows that Wilkinson was a homophobe who harassed plaintiff because of his real or perceived sexual orientation. However, this case was tried as a mental disability, not a sexual orientation case, and plaintiff adduced no proof that Wilkinson, or anyone at Marathon, acted because of plaintiff's mental impairment depression."

■   We disagree. Although the evidence might well suggest that Wilkinson's original motivation for engaging in the harassing conduct that first created the hostile work environment was homophobia, a reasonable jury could conclude that Wilkinson continued to engage in that conduct, at least in material part, because of plaintiff's disability. As we have frequently observed, proof of motivation is rarely direct and often, necessarily, circumstantial and inferential. *See McCuller v. Gaudry,* 59 Or App 13, 17, 650 P2d 148 (1982) ("The intent to practice * * * discrimination exists in the mind of the person practicing it and, unless it is an openly declared policy, is apt to be difficult to prove. * * * An inference drawn from the conduct giving rise to the particular charge or cause of action may be the only proof available."). The circumstantial evidence supporting such an inference included: (1) Wilkinson's repeated statements on the videotape and to Zirk that plaintiff was "mental" or "delusional" or "paranoid" to think that Wilkinson was harassing him; (2) Wilkinson's knowledge that plaintiff attempted suicide; (3) Wilkinson's note to another coworker following plaintiff's suicide attempt that plaintiff needed "professional help"; (4) Wilkinson's continuing harassment despite Zirk's warnings to stop harassing plaintiff; and (5) Wilkinson's "crazy lunatic faggot" slur that precipitated plaintiff's final departure. Thus, we affirm the trial court's denial of the directed verdict motion against the hostile work environment specification.

Finally, with respect to both statutory discrimination specifications, Marathon argues that the trial court erred in denying its motion to strike plaintiff's request for punitive damages pursuant to ORS 659.121(2). Marathon does not contend that plaintiff's proof was *generally* insufficient to support an award of such damages. Rather, its argument is narrow: Invoking *Wheeler*, 286 Or at 117-19, and *Hall v. The May Dept. Stores,* 292 Or 131, 145-46, 637 P2d 126 (1981), Marathon argues that the conduct that gave rise to its statutory liability was expressive and, thus, cannot constitutionally support an award of punitive damages.

■ Marathon's reliance on *Wheeler* and *Hall* is misplaced. Here, in contrast to those cases, Marathon's punitive liability was not based on expression. For example, as framed by the court's instructions, Marathon's liability on the "hostile work environment" specification was *not* based on Wilkinson's remarks or gestures, but was, instead, based solely on Marathon's *failure to remedy* the hostile environment. That is, the gravamen of liability, as framed here, was Marathon's *failure to act*.[10] Similarly, Marathon's liability for failure to accommodate was limited to conduct: its failure to take affirmative steps to accommodate plaintiff's disability. "Although those acts undoubtedly had a communicative effect, in the sense that most purposive human activity communicates something about the frame of mind of the actor," *Huffman and Wright Logging Co. v. Wade,* 317 Or 445, 449-50, 857 P2d 101 (1993), the acts were conduct, or lack of conduct, not expression. Because the gravamen of statutory liability in both instances is failure to undertake steps to address a condition, *Wheeler* and *Hall* do not preclude punitive liability in these circumstances. We, thus, affirm the judgment on the statutory employment discrimination specifications, including the award of punitive damages.

---

[10] The court instructed the jury:

"If you find by a preponderance of the evidence that Defendant Wilkinson created a hostile work environment for plaintiff and discriminated against plaintiff in substantial part because of an actual or perceived handicap and that the *employer knew or should have known that plaintiff's work environment was hostile and failed to take appropriate corrective action to end the harassment,* then you may find that plaintiff has proven the second count * * *. In order for Defendants' conduct to be a cause of plaintiff's injury an act or *omission* must be a substantial factor in producing the injury." (Emphasis added.)

## II. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Both Wilkinson and Marathon challenge the judgment of compensatory and punitive damages on plaintiff's claims against each for intention infliction of emotional distress. As described below, we affirm as to Wilkinson and reverse as to Marathon.

Wilkinson raises three arguments: First, his conduct was not sufficiently egregious to "transgress the bounds of socially tolerable" conduct. *See McGanty v. Staudenraus,* 321 Or 532, 543, 901 P2d 841 (1995). Second, in all events, because the jury failed to award compensatory damages against Wilkinson individually,[11] the award of punitive damages was, necessarily, legally insufficient. Third, the award of punitive damages was precluded under *Wheeler* and *Hall* as being inpermissibly based on expression. We reject each argument.

The short answer to Wilkinson's first argument is that there was ample evidence for the jury to conclude that Wilkinson was a sadistic bully who enjoyed preying on plaintiff's fragile mental state, and who, despite plaintiff's pleas to stop, did everything he could to torment plaintiff, even after plaintiff's suicide attempt. The totality of Wilkinson's conduct, by any measure, was extraordinarily vicious and intolerable. The jury also reasonably could have concluded that Wilkinson's campaign of torment included the "keying" of plaintiff's car and the brick-throwing incident at plaintiff's home.[12]

The answer to Wilkinson's second argument—that the jury's failure to award compensatory damages against him precludes the award of punitive damages is even shorter: *Building Structures, Inc. v. Young,* 131 Or App 88, 883 P2d

---

[11] *See* Special Verdict Interrogatory No. 9. 157 Or App at 297.

[12] Defendant argues that any determination that Wilkinson was responsible for those incidents would be impermissibly speculative. However, given Wilkinson's ongoing hostility toward plaintiff, the facts that Wilkinson knew where plaintiff lived and knew plaintiff's car, when coupled with the temporal proximity of those activities to the workplace harassment, permitted the jury to reasonably conclude that Wilkinson was responsible.

1308 (1994), *rev allowed* 320 Or 587 (1995). Here, as in *Building Structures, Inc.*, defendant did not point out the inconsistency in the jury's verdict and cannot complain about it now.

■        Finally, Wilkinson argues that all of his conduct was expressive and, thus, regardless of any malice, *Wheeler* and *Hall* preclude liability for punitive damages. Wilkinson's argument thus depends, necessarily, on the premise that plaintiff failed to present *any* evidence of nonexpressive conduct by Wilkinson warranting the imposition of punitive damages. Because that premise is wrong, Wilkinson's argument fails.

Before addressing the particulars of plaintiff's proof, two overarching considerations should be emphasized. First, in this case, the jury was explicitly instructed that it could base any award of punitive damages only on nonexpressive conduct. *See Lewis v. Oregon Beauty Supply Co.*, 302 Or 616, 629, 733 P2d 430 (1987) (noting that defendant may request a limiting instruction[13] for the jury to consider only nonexpressive conduct in its determination of punitive damages). Second, although under *Hall* and its progeny expression itself cannot be the *basis* for punitive liability, nothing in those cases precludes a jury from considering expression as part of the *context* in which the jury assesses the egregiousness or motivation for nonexpressive conduct.

Turning to the merits, plaintiff here did present evidence of nonexpressive conduct by Wilkinson—the "keying" and brick-throwing incidents. That conduct was not just tortious, but criminal in character. *See, e.g., ORS* 164.354(1)(b) (criminal mischief in the second degree). Considering that conduct in context, the jury reasonably could have determined that that conduct not only was sufficiently egregious

---

[13] The court in this case, instructed the jury as follows:

"I give you the following specific guidance. The First Amendment of the United States Constitution and the First Amendment of the Oregon Constitution specifically protects freedom of speech. Conduct can be both expressive and nonexpressive. No punitive damages can be awarded for purely expressive speech. * * *"

Defendants did not request that instruction. Rather, the instruction was submitted to the court by plaintiff's counsel because the court, on its initiative, asked plaintiff's counsel to draft such an instruction.

to "transgress the bounds of social toleration," but also demonstrated malicious intent and warranted an award of punitive damages. We thus affirm the judgment against Wilkinson for IIED.

■ Finally, we address Marathon's challenge to the judgment against it for IIED. Marathon's arguments pertain only to direct liability because, although the jury found that Wilkinson acted within the course and scope of his employment, the jury awarded no damages against Marathon for *vicarious* IIED liability.[14] Marathon asserts that it cannot be directly liable for IIED because plaintiff's only complaint about Marathon is that it failed to remedy a hostile work environment, and that a failure to act is not sufficiently outrageous. Plaintiff responds that Zirk's awareness of plaintiff's mental illness and suicide attempt, coupled with Zirk's failure to stop the harassment and creation of the self-justifying video, was sufficiently egregious to establish IIED.

*Lewis v. Oregon Beauty Supply Co.* is controlling. There, an employee was sexually harassed by a coworker— who happened to be the son of the principal owner—and, as here, the principal owner of the employer corporation failed to remedy the harassment. The court concluded that the principal's failure to respond to the plaintiff employee's complaint was insufficient to constitute IIED:

> "[The principal owner's] actions in this case, which involved tolerance of his son's misconduct, do not rise to the level of the cold-blooded oppressive browbeating of *Hall*, nor were the acts here as socially intolerable as those of the other cited cases. The facts of this case are closer to those in *Patton v. J.C. Penney, Co.*, [301 Or 117, 719 P2d 854 (1986)] * * *.
>
> "* * * * *
>
> "In this case [the principal owner] failed to respond to the problem, but we do not think that this is the type of behavior against which the tort was meant to protect." 302 Or at 627-28.

---

[11] *See* Special Verdict Interrogatories Nos. 10 and 11. 157 Or App at 297-98.

Thus, *Lewis* established the principle that mere non-responsiveness to claims of workplace harassment is insufficient to support liability for IIED.[15] Here, plaintiff's direct liability claim against Marathon, as framed by the special verdict form, was confined solely to whether Marathon "allowed" the harassment. *See* Special Verdict Interrogatory No. 6. 157 Or App at 297. Thus, as submitted to the jury, plaintiff's IIED claim against Marathon was *not* that Marathon purposely initiated or encouraged Wilkinson's conduct or was somehow purposefully nonresponsive to plaintiff's complaints. Rather, the gravamen was mere "allowance." Under *Lewis*, such allowance is insufficient to establish IIED. Accordingly, we reverse the IIED judgment against Marathon.

Judgment against appellant Marathon Printing, Inc., for intentional infliction of emotional distress reversed; otherwise affirmed.

---

*McGanty*, revisited and repudiated *Lewis'* analysis as to the requisite mental st or IIED but did not call into question its holding as to the nature of *conduct* su ent to support such liability. 321 Or at 544-51.