Argued and submitted April 2, affirmed July 29, 1986

ROACH,
*Petitioner on review/
Respondent on review,*

*v.*

MEAD, dba Berentson & Mead,
*Respondent on review,*

*and*

BERENTSON, dba Berentson & Mead,
*Respondent on review/
Petitioner on review.*

(CC A8303-01681; CA A32821; SC S32368; S32382)

722 P2d 1229

Paul R. Duden, of Tooze, Marshall, Shenker, Holloway & Duden, Portland, argued the cause and filed the petition for review for petitioner on review/respondent on review Roach.

Emil R. Berg, of Hallmark, Griffith & Keating, P.C., Portland, argued the cause and filed the petition for review for respondent on review/petitioner on review Berentson.

No appearance for respondent on review Mead.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson and Jones, Justices.

JONES, J.

**JONES, J.**

The issues in this case are: (1) Is the partner of an attorney who negligently advises a client vicariously liable to the client for damages? (2) Does Oregon's Unlawful Trade Practices Act (UTPA), ORS 646.605 to 646.652, apply to the actions of defendant's partner, thus entitling plaintiff to attorney fees?

At trial, defendant, David J. Berentson, moved for a directed verdict, contending that he was not vicariously liable for the negligent acts of his partner, Kenneth E. Mead, because the negligent acts were outside the scope of the partnership's business. Defendant also moved for a directed verdict on the UTPA claim contending that the UTPA did not apply to the services rendered by Mead to plaintiff, William Roach. The trial court denied the motions, and the jury found defendant liable for $20,000 damages on both claims. The Court of Appeals held that defendant attorney was vicariously liable for his former partner's negligence, but not liable under the UTPA claim. We affirm the Court of Appeals.

In *Shepler v. Weyerhaeuser Company,* 279 Or 477, 484, 569 P2d 1040 (1977), which concerned a jury verdict for plaintiff in a negligence action, we defined our scope of review in civil actions at law:

> "* * * Since the verdict was for plaintiff, we could not find error * * * unless we could affirmatively say there is no evidence to support the verdict. (Oregon Constitution, Amended Art. VII, § 3.) Furthermore, we should be precluded from weighing the evidence and should be required to consider it in the light most favorable to plaintiff (*Myers v. Cessna Aircraft,* 275 Or 501, 553 P2d 355 (1976)), together with all inferences favorable to plaintiff which could reasonably be drawn from such evidence. (*Jacobs v. Tidewater Barge Lines,* 277 Or 809, 562 P2d 545 (1977).)" (Footnoted material in parentheses.)

*See also Krause v. Eugene Dodge, Inc.,* 265 Or 486, 490, 509 P2d 1199 (1973). Under this scope of review for civil jury verdicts, we state the facts of this case.

Mead, defendant's former law partner, first represented plaintiff in December 1974 on a traffic charge and later represented plaintiff on several occasions. On November 1, 1979, Mead and defendant formed a law partnership. Mead

continued to advise plaintiff on other traffic charges and on business dealings. Defendant prepared plaintiff's income tax returns.

In June 1980, plaintiff sold his meter repair business for $50,000. On November 25, 1980, plaintiff asked for Mead's advice on investing $20,000 in proceeds from the sale. Plaintiff testified that Mead told plaintiff that "he would take [the money] at 15 percent. So, I let him have it. * * * I trusted him and felt he would look out for me." Plaintiff considered Mead's advice to be legal advice; he testified that otherwise he would not have consulted an attorney.

After plaintiff agreed to the loan, Mead executed a promissory note for $20,000 payable on or before November 25, 1982, at 15 percent interest. Mead said that he would be receiving a large sum of money with which he would repay plaintiff. Mead offered to secure the loan with a second mortgage on his house, and plaintiff replied that he should do "whatever you think is best." Mead did not secure the loan.

On May 1, 1981, Mead went to plaintiff's home and requested a $1,500 loan, telling plaintiff he was in financial trouble but "had big money coming in." Plaintiff agreed to the loan and Mead added the $1,500 to the amount due on the promissory note. Mead did not repay any money to plaintiff and later was declared bankrupt.[1]

Plaintiff sued defendant's partnership for negligence, alleging that the partnership failed to disclose the conflicting interests of plaintiff and Mead, to advise plaintiff to seek independent legal advice, to inform plaintiff of the risks involved in an unsecured loan, and to advise plaintiff that the loan would not be legally enforceable because the rate of interest was usurious, ORS 82.010 (1979), *former* ORS 82.110 (*repealed by* Or Laws 1981, ch 412, § 24). Plaintiff also alleged under the UTPA that the partnership created a likelihood of confusion concerning the service it provided to plaintiff, ORS 646.608(1)(b), represented the legal service as having qualities

---

[1] On January 18, 1983, this court accepted Mead's resignation from the bar. He stated that he had chosen not to contest disciplinary charges alleging that he had "borrowed $45,000 from a client, that he misrepresented the priority of the security given for the loan and that he subsequently forged a satisfaction of the mortgage given as security." 43 Or St B Bull, June 1983, at 42. Mead was convicted of theft by deception because of the loan referred to in the disciplinary charges. *Id.*

that it did not possess, ORS 646.608(1)(g), and misleadingly represented the nature of the loan, ORS 646.608(1)(k).

The trial jury found defendant vicariously liable for Mead's negligence in advising plaintiff on the $20,000 loan[2] and for violations of the UTPA. The trial court awarded $8,000 in attorney fees under the UTPA. On appeal, the Court of Appeals held that although defendant was liable for Mead's negligence, defendant was not liable under the UTPA because "the UTPA does not cover such service for a mere loan of money at interest, whatever the lender's intended use of the profits of the loan." 76 Or App 83, 87, 709 P2d 246 (1985). The Court of Appeals' reversal of the UTPA claim did not affect the amount of the jury award but did eliminate the award of attorney fees. We affirm the Court of Appeals.

## I. VICARIOUS LIABILITY

Plaintiff contends that Mead negligently advised him about the loan and that defendant should be vicariously liable for Mead's negligent legal advice. Defendant, while conceding that Mead was negligent,[3] argues that the transaction between plaintiff and Mead was a personal loan outside the scope of the partnership, and that the evidence did not prove that soliciting personal loans was within Mead's express, implied or apparent authority as defendant's law partner.

Oregon's Uniform Partnership Law, ORS 68.010 to 68.650, governs the liability of partnerships for the acts of partners. ORS 68.210 provides in pertinent part:

"(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including

---

[2] The jury found defendant not liable for the additional $1,500 loan, presumably because it determined that the loan was personal and that giving legal advice concerning the loan was not within the scope of the partnership's business.

[3] Defendant assigns as error the trial court's admission of expert testimony concerning Mead's negligence. We agree with the Court of Appeals that the evidence was relevant for purposes beyond the stipulation. The Court of Appeals stated:

"* * * Defendant's primary defense was that the loan was a private business transaction between plaintiff and Mead and was not part of the business of the legal partnership. The challenged evidence tended to rebut that defense by showing that Mead was negligent *as a lawyer*. That Mead's negligence was in giving or failing to give legal advice was relevant to whether he acted within the scope of the partnership's business. * * *" 76 Or App 83, 86, 709 P2d 246 (1985) (emphasis in original).

the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which the partner is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom the partner is dealing has knowledge of the fact that the partner has no such authority.

"(2) An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

"* * * * *

"(4) No act of a partner in contravention of a restriction on authority shall bind the partnership to persons having knowledge of the restriction."

ORS 68.250 provides:   .

"Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act."

ORS 68.270(1) provides:

"All partners are liable:

"(1) Jointly and severally for everything chargeable to the partnership under ORS 68.250 and 68.260."

Liability of partners for the acts of copartners is based on a principal-agent relationship between the partners and the partnership. "Partners are jointly and severally liable for the tortious acts of other partners if they have authorized those acts or if the wrongful acts are committed 'in the ordinary course of the business of the partnership.' ORS 68.250, 68.270." *Wheeler v. Green,* 286 Or 99, 126, 593 P2d 777 (1979). The issue in this case is whether Mead's failure to advise plaintiff on the legal consequences of the loan was "in the ordinary course of the business of the partnership."

In *Croisant v. Watrud,* 248 Or 234, 432 P2d 799 (1967), this court confronted a similar issue of the vicarious liability of a partnership for the wrongful acts of a partner. In *Croisant,* the client of an accountant sued the accounting partnership, claiming damages for the accountant's breach of

trust. The accountant collected income from the client's property and then made unauthorized payments to the client's husband from the money. The defendant partnership contended that the collection services were personal dealings of the accountant with the client and not part of the partnership's business. This court held:

"If a third person reasonably believes that the services he has requested of a member of an accounting partnership is undertaken as a part of the partnership business, the partnership should be bound for a breach of trust incident to that employment even though those engaged in the practice of accountancy would regard as unusual the performance of such services [collecting and disbursing funds] by an accounting firm." 248 Or at 242.

The court stated that the reasonableness of the third person's belief that "the service he seeks is within the domain of the profession is a question which must be answered upon the basis of the facts in the particular case." *Id.* at 243.

Defendant contends that *Croisant* may be distinguished from the case at bar because in *Croisant* "the misconduct occurred in the course of * * * activities which the court held could reasonably be viewed as within the scope of the accounting firm's business," while in this case "[t]here was no evidence that the act of an attorney in taking a personal loan from a client could reasonably be viewed as part of the business of a law firm." However, defendant admits that "the evidence most favorable to Plaintiff was simply that Plaintiff thought Mead was giving him investment advice and that the giving of advice regarding legal aspects of loans and investments in general is a normal part of law practice." Defendant thus concedes the validity of plaintiff's argument that plaintiff reasonably believed that investment advice was within the scope of the partnership's business; plaintiff does not contend that soliciting loans from clients was partnership business.

In the case at bar, the jury determined that plaintiff reasonably believed that the partnership's legal services included investment advice. We agree with the Court of Appeals that:

"* * * There is expert and other testimony from which the jury could have found that plaintiff relied on Mead for legal advice concerning the loan, that a lawyer seeking a loan from a

client would be negligent if the lawyer did not tell the client to get independent legal advice and that a lawyer advising a client about this particular loan would seek to secure it and would warn the client of the risks involved in providing a usurious interest rate." 76 Or App at 85.

The Court of Appeals' rationale is buttressed by our decisions in bar disciplinary proceedings concerning loans from clients to lawyers. *See, e.g., In re Montgomery,* 292 Or 796, 643 P2d 338 (1982); *In re Drake,* 292 Or 704, 642 P2d 296 (1982). In *Montgomery* this court reprimanded a lawyer for failing to disclose his conflict of interest, holding that:

"When a lawyer borrows money from a non-lawyer client who is not in the business of lending money, the lawyer should assume that the client is relying on the lawyer for the legal aspects of the transaction to the same extent that the client would rely on the lawyer for advice were the client making the loan to a third person, unless the opposite is expressly stated.

"It would not occur to a trusting client that the lawyer would advise the client to enter into an unlawful contract. Thus, had [the client] consulted [the attorney] about a loan to a third person, although advice as to the creditworthiness of the third person would likely not be expected, advice as to the legal effect of the usurious rate of interest would likely have been given. In addition, a competent lawyer might have recommended that security be given by the borrower." 292 Or at 802.

When a lawyer borrows money from a client, this court requires that the lawyer advise the client about the legal aspects of the loan. Mead's failure to advise plaintiff to seek independent legal advice, that loans usually should be secured and the debtor's financial status checked, and that the rate of interest was usurious were all failures of Mead as a lawyer advising his client. Because these failures occurred within the scope of the legal partnership, responsibility for Mead's negligence was properly charged to defendant as Mead's law partner. The trial court did not err in submitting the negligence issue to the jury.

## II. THE UTPA CLAIM

In his complaint, plaintiff alleges that defendant partnership violated certain provisions of the UTPA. He attempts to plead his case within the only arguably relevant sections of ORS 646.608(1), which provide:

"A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following:

"* * * * *

"(b) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.

"* * * * *

"(g) Represents that real estate, goods or services are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if they are of another.

"* * * * *

"(k) Makes false or misleading representations concerning credit availability or the nature of the transaction or obligation incurred."

Defendant contends not only that plaintiff failed to allege violations of these specific sections, but also that the UTPA does not cover Mead's acts because the UTPA covers only " '[r]eal estate, goods or services' * * * which are or may be *obtained primarily for personal, family or household purposes."* ORS 646.605(7) (emphasis added).

This court construed the scope of the UTPA's coverage in *Searle v. Exley Express, Inc.,* 278 Or 535, 564 P2d 1054 (1977). In *Searle,* the plaintiff, who had purchased a truck tractor, alleged that the seller misrepresented the truck's condition. This court held that the UTPA did not cover the purchase. Justice O'Connell wrote:

"We will assume, as plaintiff asserts, that the truck was purchased as a family investment and to provide employment for plaintiff's son. In this sense the purchase could be deemed to have been made for 'personal, family or household purposes.' But this looks solely at the subjective motivation of the purchaser, and as we have already stated, we do not regard the statute as having this broad sweep. If goods are customarily bought by a substantial number of purchasers for personal, family or household uses and were, in fact, bought by the plaintiff for his or someone else's use and not for resale, the statute applies. Certainly a truck designed for the business of hauling freight does not fall within that classification. The purchase of a truck to carry on a freight business may fulfill personal and family needs in a particular case but generally it would be purchased to carry on a business, and it is this

customary or predominant purpose which is to be used in characterizing the transaction. Therefore, we hold that the purchase in the present case did not come within the statute." 278 Or at 539-40.

■    Applying the rationale and test of *Searle* to the case at bar, we examine the customary or predominant purpose of the legal services obtained by plaintiff to determine whether the UTPA covers such services. Plaintiff presented no evidence concerning the nature of his investment or the customary or predominant use of such profits by persons who make such loans. We cannot say as a matter of law that loaning money at an interest rate at or above market rates, and obtaining legal advice concerning such loans, is generally and customarily for a personal, family or household purpose. The loan may have been for a personal or business purpose, but no evidence in the record of this case allow us to draw any conclusions on this issue. Because plaintiff failed to prove facts that would bring his claim within the UTPA, we hold that the UTPA did not apply to the transaction at issue here. The legal services plaintiff received concerned the investment of money and were not manifestly for personal use. The Court of Appeals correctly held that the UTPA does not cover the transaction at issue.

    The Court of Appeals is affirmed.