Argued and submitted November 22, 1995, reversed and remanded February 7, petition for review denied May 28, 1996 (323 Or 265)

James P. CULLEN
and Charlon Cullen,
husband and wife,
*Appellants,*

*v.*

INVESTMENT STRATEGIES, INC.,
an Oregon corporation,
*Respondent.*

(94-CV-0195-MS; CA A88494)

911 P2d 936

Michael W. Peterkin argued the cause and filed the briefs for appellants.

Gary Abbott Parks argued the cause and filed the brief for respondent.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

**HASELTON, J.**

Plaintiffs appeal from a judgment dismissing their claim against the defendant mortgage broker under the Unlawful Trade Practices Act, ORS 646.605, *et seq.* The trial court concluded that, because defendant's business was indirectly related to the lending of money and the extension of credit, plaintiffs' claim was not within the UTPA's purview. We reverse and remand.

Plaintiffs' UTPA claim alleges, in part:

"1.

"At all times material herein, Investment Strategies, Inc., was and is a duly registered corporation in the State of Oregon in the business of mortgage brokering in Deschutes County.

"* * * * *

"3.

"On or before October 27, 1993 Plaintiffs made an application to Defendant to obtain a personal loan to purchase a home located at 17742 Red Wing Lane, Sunriver, Deschutes County, State of Oregon.

"4.

"Plaintiffs applied for a residential loan through Defendant in the amount of $158,000.00. Defendant issued a good-faith estimate which included a one percent (1%) loan origination fee, a one percent (1%) loan discount fee and a one percent (1%) mortgage broker fee. The estimated settlement charges for the three fees totaled $4,740.00.

"5.

"After receiving the good-faith estimate, Plaintiffs complained that a three point mortgage fee as alleged above was unreasonable. On or about November 23, 1993 Defendant issued a new good-faith estimate which deleted the lender origination fee of one percent (1%).

"6.

"When Defendant issued its second good-faith estimate, it failed to disclose to Plaintiffs that Plaintiffs had been charged higher than market interest rate so Defendant could recover the premium yield from the lender, American Residential.

"7.

"Investment Strategies, Inc., placed Plaintiffs' loan at an estimated quarter percent higher than the market rate to recover a kickback of $989.06 from the lender.

"* * * * *

"11.

"Defendant's conduct was in violation of the Unlawful Trade Practices Act in one or more of the following particulars:

"(a)  Misrepresented the market interest rate to Plaintiffs;

"(b)  Misrepresented the total loan cost to be paid by Plaintiffs;

"(c)  Failed to disclose the premium yield to Plaintiffs in its second good-faith estimate;

"(d)  Failed to disclose financing options to Plaintiffs to reduce mortgage interest rate;

"(e)  Failed to pass through the premium yield in the amount of $989.06 to Plaintiffs.

"12.

"Defendant's, Investment Strategies', misrepresentations constituted a willful violation of the Unlawful Trade Practices Act because Defendant knew or should have known that its conduct was in violation of the statutes.

"13.

"Defendant's non-disclosure regarding the nature of the loan transaction with respect to the interest rate and the premium yield payment was willful because Investment Strategies, Inc., knew or should have known that such non-disclosure was a violation of the Unlawful Trade Practices Act."

Defendant moved to dismiss the UTPA claim, arguing that mortgage brokers cannot be liable under the UTPA because their business pertains to the extension of credit. The trial court, citing *Haeger v. Johnson*, 25 Or App 131, 548 P2d 532 (1976), and *Lamm v. Amfac Mortgage Corp.*, 44 Or App 203,

605 P2d 730 (1980), concluded that "mortgage brokers are *exempt* from UTPA applications" (emphasis in original) and dismissed the UTPA claim.[1]

In reviewing a dismissal for failure to state a claim, ORCP 21 A(8), we assume the truth of plaintiffs' pleadings, including particularly plaintiffs' allegation that "Defendant did not loan money or extend credit to Plaintiffs." *Glubka v. Long*, 115 Or App 236, 238, 837 P2d 553 (1992). Thus, the issue reduces to whether defendant's conduct nevertheless falls outside the UTPA's coverage. We turn first, as did the trial court, to *Haeger* and *Lamm*.

In *Haeger*, the petitioner, a manager of a corporation "engaged in the business of making loans, extending credit and purchasing installment obligations" sought to set aside an UTPA civil investigative demand. The petitioner asserted that the UTPA's investigative demand provisions, ORS 646.618, did not apply because his employer was not "engaged in the sale of goods and services" subject to the Act. 25 Or App at 133. The trial court set aside the investigative demand, and we affirmed. We emphasized that a civil investigative demand under ORS 646.618 must pertain to the "sale" or distribution of "goods and services"[2] and concluded:

"The activity sought to be investigated in this case is the extension of consumer credit. * * * [W]e are unable to agree

---

[1] Plaintiffs also alleged a claim for breach of fiduciary duty. After the court dismissed their UTPA claim, plaintiffs voluntarily dismissed their breach of fiduciary duty claim. That dismissal is not at issue here.

[2] ORS 646.618(1) provides:

"When it appears to the prosecuting attorney that a person has engaged in, is engaging in, or is about to engage in any act or practice declared to be unlawful by ORS 646.607 or 646.608, the prosecuting attorney may execute in writing and cause to be served an investigative demand upon any person who is believed to have information, documentary material or physical evidence relevant to the alleged or suspected violation. The investigative demand shall require such person, under oath or otherwise, to appear and testify, to answer written interrogatories, or to produce relevant documentary material or physical evidence for examination, at such reasonable time and place as may be stated in the investigative demand, or to do any of the foregoing, *concerning conduct of any trade or commerce* which is the subject matter of the investigation." (Emphasis supplied.)

When *Haeger* was decided, ORS 646.605(1) defined "trade or commerce" as

"the advertising, offering for sale, sale or distribution of any services or any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state."

with the Attorney General that the lending of money is a sale of goods or services. While the making of loans would seem to have some aspects of the sale of a service, we are unable to find any cases which hold such to be the case. 'Sale' is a word of precise legal meaning. A loan of money is not a sale. A loan is defined as 'to let out (money) for temporary use on condition that it be repaid with interest at an agreed time * * *.' Webster's Third New International Dictionary (1969)." *Id.* at 135 (citations omitted).

We also rejected the state's argument that ORS 646.608-(1)(k) evinced the legislature's intent to bring loans "within the ambit" of the UTPA:

"ORS 646.608(1)(k) provides as follows:

" '[A person engages in an unlawful practice when he] [m]akes false or misleading representations concerning the availability of credit or the nature of the transaction or obligation incurred.'

"While this section could be read as applying to the activities of a lending agency, it is more reasonably interpreted as referring to credit only with respect to 'transaction[s] or obligation[s] incurred' in connection with the sale of goods." *Id.*

In *Lamm*, the plaintiffs sued the defendant mortgage company, alleging that the defendant had violated ORS 646.608(1)(s)[3] by making "false or misleading representations" regarding "the discount fee plaintiffs would be required to pay in a transaction involving a government insured loan to the purchaser of their house." 44 Or App at 205. We affirmed the trial court's dismissal of the complaint, concluding that the UTPA "does not apply to loans or extension of credit." *Id.* In so holding, we extended *Haeger's* result, which focused on the meaning of "sale" in ORS 646.618, to ORS 646.608(1)(s), which does not refer to "sale" but,

---

[3] ORS 646.608(1)(s) provides:

"A person engages in an unlawful practice when in the course of the person's business, vocation or occupation, the person does any of the following:

"* * * * *

"(s) Makes false or misleading representations of fact concerning the offering price of, or the person's cost for real estate, goods or services."

instead, refers to the "offering price or the person's cost for * * * goods or services."[4]

The only post-*Lamm* case addressing the UTPA's application to loans is *Roach v. Mead*, 76 Or App 83, 709 P2d 246 (1985), *aff'd* 301 Or 383, 722 P2d 1229 (1986). There, the plaintiff asserted negligence and UTPA claims against the defendant lawyer, based on the plaintiff's loans to the defendant's law partner. The plaintiff alleged that, in persuading him to make the loans, the partner gave professional advice and made various misrepresentations that violated the UTPA and that the defendant was vicariously liable for those violations. In particular, the plaintiff alleged that the partner advised him to accept legally unenforceable promissory notes in consideration for the loan.[5] The defendant moved for a directed verdict against the UTPA claim, asserting, *inter alia*, that the UTPA did not apply to his partner's rendition of professional services in connection with the loans. The trial court denied that motion, and the jury returned a verdict for the plaintiff on both the UTPA claim and the negligence claim.

On appeal, the defendant assigned error to the denial of his directed verdict motion, arguing that the UTPA did not apply to professional services rendered to a lender, even if the lender intended to use interest derived from the loan for personal, family or household purposes. ORS 646.605(7). We agreed. At the outset, we distinguished the circumstances in *Roach* from those in *Lamm*:

---

[4] ORS 646.605(7) provides, in part:

" 'Real estate, goods or services' means *those* which are or may be obtained primarily for personal, family or household purposes * * * but does not include insurance." (Emphasis supplied.)

Although that definition existed in substantially the same form when *Haeger* and *Lamm* were decided, neither decision refers to it. That may be because the definition is somewhat circular — the referent for "those" appears to be "real estate, goods or services." The UTPA does not set out separate definitions of "real estate," "goods," or "services."

[5] The plaintiff in *Roach* alleged that the partner had committed malpractice by, *inter alia*, rendering legal advice notwithstanding a conflict of interest and failing to inform him of the substantial likelihood that the promissory note would be uncollectible. The plaintiff further alleged that the partner's conduct violated the UTPA by "representing that legal services had qualities they did not," *see* ORS 646.608(1)(e) and (g), and by "creating a likelihood of confusion or misunderstanding as to such services." *See* ORS 646.608(1)(b).

"We have held that the UTPA does not cover the business of lending money and that *borrowers* may not seek UTPA remedies from misleading statements made by lenders. *Lamm*[, 44 Or App 203]. That issue is different from the question in this case, which is whether a *lender* may seek UTPA remedies for services the lender receives while making a loan." 76 Or App at 87 n 3 (emphasis in original).

We then concluded that, because "money is a medium, not an article, of commerce," *id.*, the interest from a loan was not "goods or services" within the UTPA's purview:

"We can say that a hay baler, purchased for use on a farm, or a truck purchased to haul freight were purchased for business rather than family use, even if the business was a family business. * * * Money, however, is impossible to categorize. It may be used to purchase 'real estate, goods or services' but it is not itself one of those things. If this loan were within the UTPA, so is every other source of money which plaintiff might use for family purposes, including his wages. A person who simply loans money, with no other factors involved, cannot be within the protections of the UTPA. The court erred in denying defendant's motion for directed verdict on the UTPA claim." *Id.* at 87-88 (footnotes omitted).

The Oregon Supreme Court affirmed, but on different grounds. Rather than holding that the UTPA categorically excluded legal services pertaining to a lender's extension of credit, the court held that the plaintiff in *Roach* had failed to prove that he intended to use the profits from the loan for "personal or household use" within the meaning of the UTPA. Because the plaintiff had failed in that proof, he had, in turn, failed in his proof that the legal services relating to the loan were for "personal or household use":

"[W]e examine the customary or predominant purpose of the legal services obtained by plaintiff to determine whether the UTPA covers such services. Plaintiff presented no evidence concerning the nature of his investment or the customary or predominant use of such profits by persons who make such loans. We cannot say as a matter of law that loaning money at an interest rate at or above market rates, and obtaining legal advice concerning such loans, is generally and customarily for a personal, family or household use. The loans may have been for a personal or business purpose, but no evidence in the record of this case allows us to draw any

conclusions on this issue. * * * The legal services plaintiff received concerned the investment of money and were not manifestly for personal use." 301 Or at 392.

■■  From these precedents, we glean two principles. First, a lender's material nondisclosures or misrepresentations to a borrower concerning the terms of a loan are not actionable under the UTPA. Second, professional services rendered to lenders generally cannot give rise to UTPA liability unless the lender can demonstrate that such services pertained to a loan whose profits were to be invested for personal, family or household purposes, rather than business purposes. The cases do not, however, explicitly resolve the question presented here: Can a nonlender who performs loan-related professional services for borrowers be liable under the UTPA for material nondisclosures or misrepresentations regarding either (a) the provision of such services or (b) the terms of the loan itself?

■■  We conclude, by analogy to *Roach*, that where borrowers retain the professional services of a nonlender in connection with a nonbusiness (*i.e.*, personal, family or household purpose) loan, those services fall within the UTPA, even though the loan itself does not. Consequently, a nonlender's material nondisclosures or misrepresentations regarding the character, quality, or cost of such services are actionable under the UTPA. Thus, for example, a residential loan broker who misrepresents the costs of its brokerage services is subject to UTPA liability.

■  The issue of whether a nonlender can be liable under the UTPA for material nondisclosures or misrepresentations concerning the terms of a loan itself — *e.g.*, interest rates, finance charges, etc. — is more difficult. On the one hand, under *Haeger*, and especially *Lamm*, a loan is not a "good" or "service" for UTPA purposes; otherwise, the mortgage company's alleged misrepresentations in *Lamm* would have been actionable under ORS 646.608(1)(s). Thus, if in the course of its business a nonlender misrepresents the offering price of a loan, that misrepresentation should not pertain to a "good or service." On the other hand, in a loan brokerage context, the line between representations regarding the cost or quality of a loan and misrepresentations regarding the cost or quality

of brokerage services may become blurred, and even illusory. A broker's representations about the terms on which he or she can place a loan may be essential to the rendition of brokerage services.

■ The question is close. Nevertheless, and despite our recognition that the UTPA is to be construed consistently with its consumer protective purposes, *Denson v. Ron Tonkin Gran Turismo, Inc.*, 279 Or 85, 90 n 4, 566 P2d 1177 (1977), we conclude that a nonlender's material nondisclosures or misrepresentations of a loan's attributes are not actionable under the UTPA. We so conclude for two related reasons. First, imposing liability would conflict with *Lamm's* rationale. *Lamm* rests, ultimately, on the premise that a loan is not a "good or service"; that premise is constant, regardless of whether the party making a representation about a loan is a lender or a nonlender. Second, imposing liability would yield the incongruous result by which a lender who misrepresents the attributes of a loan is not liable under the UTPA, but a nonlender who makes identical representations is liable under the Act.[6]

■ We return to plaintiffs' pleadings. Plaintiffs alleged that they engaged defendant to place their application for a "personal" residential real estate loan with the lender "having the most favorable rates beneficial to plaintiff." Consequently, defendant's brokerage services were rendered in connection with a consumer transaction. Plaintiffs then alleged that defendant violated the UTPA in one or more of five particulars:

"(a)  Misrepresented the market interest rate to Plaintiffs;

"(b)  Misrepresented the total loan cost to be paid by Plaintiffs;

"(c)  Failed to disclose the premium yield to Plaintiffs in its second good-faith estimate;

"(d)  Failed to disclose financing options to Plaintiffs to reduce mortgage interest rate;

---

[6] We observe that *Lamm* did not purport to depend on the availability of alternative remedies against lenders under the fair credit or banking laws. Moreover, although the court in *Haeger* noted the petitioner's alternative argument that federal credit protection laws and state and federal banking laws precluded the UTPA's application to lending institutions, 25 Or App at 133, it expressly declined to reach those arguments. *Id.* at 135.

"(e)  Failed to pass through the premium yield in the amount of $989.06 to Plaintiffs."

■ ■   Applying the principles derived above, we conclude that specifications (a) and (b) are not actionable under the UTPA, but that specifications (c), (d) and (e) are. In particular, specifications (a) and (b) pertain solely to the loan's attributes and, thus, do not concern a "good or service." Conversely, specifications (c) and (e) allege facts supporting a reasonable inference that defendant misrepresented or failed to disclose the true cost of its services — *i.e.*, that, in addition to the brokerage fee plaintiffs paid, defendant also received a "kickback" from the lender, which was funded from the artificially inflated cost of plaintiffs' loan. Taken at face value, those allegations and reasonably related inferences adequately plead that defendant made "false and misleading representations of fact concerning the offering price of * * * services." ORS 646.608(1)(s). Moreover, although the content of specification (d) is less certain, it could reasonably encompass defendant's alleged material nondisclosure of information pertaining to the provision of brokerage services, as distinct from particular loan terms.

The trial court erred in dismissing plaintiff's UTPA claim in its entirety.

Reversed and remanded.