**COLLEGENET, INC., a Delaware corporation, Plaintiff,**

v.

**EMBARK.COM, INC., a Delaware corporation; et al., Defendants.**

**No. CIV.00–981–ST.**

United States District Court, D. Oregon.

April 4, 2001.

David B. Markowitz, Jeffrey M. Edelson, Markowitz Herbold Glade & Mehlalf, Portland, OR, for Plaintiff.

David F. Rees, Stoll Stoll Berne Lokting & Shlachter, John Folawn, Lane Powell Spears Lubersky, Portland, OR, for Defendants.

## ORDER

ROBERT E. JONES, District Judge.

Magistrate Judge Janice M. Stewart filed Findings and Recommendation on December 15, 2000, in the above entitled case. The matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R.Civ.P. 72(b). When either party objects to any portion of a magistrate judge's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the magistrate judge's report. *See* 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied,* 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

Defendant Embark has timely filed objections. I have, therefore, given *de novo* review of Magistrate Judge Stewart's rulings.

I find no error. Accordingly, I ADOPT Magistrate Judge Stewart's Findings and Recommendation (# 20) dated December

15, 2000, in its entirety. Embark's motion to dismiss and strike (# 11) is GRANTED as to CollegeNET's UTPA claim (Second Claim for Relief) and two of the allegations in the Lanham Act and unfair competitions claims (that: "Embark holds a 50 percent market share of top United States universities" and "Embark's website is the # 1 destination for college bound students" as alleged in ¶ 26B & E of the Complaint). Otherwise, Embark's motion is DENIED.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

STEWART, United States Magistrate Judge.

### *INTRODUCTION*

Plaintiff, CollegeNET, Inc. ("CollegeNET"), brings this action against defendants Embark.com, Inc., ("Embark") and Christopher Munoz ("Munoz"), alleging defamation (First Claim for Relief), unfair trade practices under the Oregon Unlawful Trade Practices Act, ORS §§ 646.605–656 ("UTPA") (Second Claim for Relief), unfair competition (Third Claim for Relief), and a violation of the Lanham Act, 15 USC §§ 1051–1127 (Fifth Claim for Relief).[1] CollegeNET also requests an order enjoining Embark from publishing false statements and claims and forcing it to publicly retract its allegedly defamatory statements (Sixth Claim for Relief). This court has jurisdiction over the Lanham Act claim pursuant to 28 USC § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 USC § 1367.

Now before the court is Embark's Motion to Dismiss and Strike (docket # 11). In particular, Embark moves to dismiss and/or strike CollegeNET's UTPA claim, unfair competition claim, punitive damages on these claims, and some of the damages

---

1. The Complaint alleges no Fourth Claim for Relief.

under the Lanham Act and unfair competition claims. For the reasons set forth below, that motion should be granted in part and denied in part.

### STANDARDS

A motion to dismiss under FRCP 12(b)(6) will be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Allwaste, Inc. v. Hecht,* 65 F.3d 1523, 1527 (9th Cir.1995); *Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). "The issue is not whether [the] plaintiff will ultimately prevail but whether the [plaintiff] is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Thus, the review is limited to the complaint, and all allegations of material fact are taken as true and viewed in the light most favorable to the nonmovant. *Buckey v. County of Los Angeles,* 968 F.2d 791, 794 (9th Cir.), *cert denied,* 506 U.S. 999, 113 S.Ct. 599, 121 L.Ed.2d 536 (1992); *Love v. United States,* 915 F.2d 1242, 1245 (9th Cir.1989).

Under FRCP 12(f), a party may make a motion to strike from a pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." " '[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial' " *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993), *rev'd on other grounds,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), quoting *Sidney–Vinstein v. A.H. Robins Co.,* 697 F.2d 880, 885 (9th Cir.1983). In a motion to strike the court must view the facts most favorably to the non-moving party. *Bank Tejarat v. Varsho–Saz,* 723 F.Supp. 516, 517 (C.D.Cal.1989).

### ALLEGATIONS

CollegeNET and Embark compete in the business of supplying computer online services for colleges and universities throughout the country. Complaint, ¶ 6. These services include supplying web-based online enrollment applications and supplying college admissions related management tools. *Id.* Through their respective web offerings, these competitors help colleges provide internet-based services to students and potential applicants. *Id.* In addition, each company operates a competing web "portal" which, among other things, allows prospective college students to search the internet for college options. *Id.* CollegeNET and Embark are two of the largest suppliers of such goods and services catering to colleges and universities and compete directly for virtually every potential account. *Id.,* ¶ 7.

Munoz is an employee of the University of Dayton and is a member of Embark's Board of Advisors. *Id.,* ¶ 3. Munoz is highly visible and influential in the market served by CollegeNET and Embark. *Id.,* ¶ 8. He is frequently quoted in the press and CollegeNET alleges that he serves an advisory role to the magazine U.S. NEWS & WORLD REPORT. *Id.*

The marketability of college application coordination services is affected by the perception by customers and potential customers of the degree to which potential college and university applicants access and use the service's portal. *Id.,* ¶ 10. Further, because they assess potential applicants' character, college admissions officials are generally highly sensitive to matters involving dishonesty. *Id.*

PCDataOnline, a respected internet website traffic rating company, releases polling results on a monthly basis to its subscribers. *Id.,* ¶ 11. PCDataOnline's service is analogous to that provided for the television industry by Nielson's. *Id.*

Subscribers use PCDataOnline's web-based report generation tools to create reports that compare the performance of the world's most popular portals and websites. *Id.* Subscribers can compare websites according to various parameters including "page views," "unique users," average time spent per user, and so on. *Id.* Shortly after PCDataOnline's release of its April 2000 polling results, CollegeNET used its PCDataOnline subscription to generate a report that ranked commercially sponsored college admissions portals by page views. *Id.* CollegeNET published this report on the web on or around May 16, 2000. *Id.* The report revealed relatively modest activity for college admissions sites in general. *Id.* The portion of the report detailing activity for Embark showed pageviews at an order of magnitude below the level routinely claimed by Embark's sales force. *Id.* By comparison, the report showed pageviews for CollegeNET at approximately twice the number showed for Embark. *Id.*

Shortly thereafter, Munoz published a written e-mail statement claiming that the report was a sham. *Id.*, ¶ 12. In his statement, Munoz claims that he conducted an investigation and:

> it appears College Net [sic] did "adapt" the report and misrepresented it as coming from PCDataOnline. I could not replicate the report when I went directly to PCDataOnline. I think the PCDataOnline people are very unhappy. It will be interesting to see what happens next . . . . If I were on a similar advisory board with College Net [sic] I would resign knowing what they did.

*Id.*

Munoz' statement that CollegeNET did "adapt" the report and misrepresented its source was false. *Id.*, ¶ 13. Munoz was unable to replicate the report because, as a non-subscriber, he had no authorization to

create such a report using the PCDataOnline Service. *Id.* Munoz' investigation was itself a sham, and his conclusions from it and statements published subsequently were made with knowledge of the falsity, with reckless disregard for the truth and/or without a reasonable belief as to their accuracy. *Id.*

On or about May 24, 2000, Embark republished portions of Munoz' statement to representatives of the Massachusetts Institute of Technology ("MIT") in an effort to convince MIT to select Embark over CollegeNET as its vendor. *Id.*, ¶ 14. Embark did not reveal that Munoz was the author or that the author was a member of Embark's board of advisors. *Id.* Instead, Embark described the source of the information as a "confidential email from an institution." *Id.* Embark falsely suggested to MIT that, in light of CollegeNET's alleged publication of a sham study, MIT should select Embark over CollegeNET because "top-tier universities (like MIT) have to be especially careful about their choice of vendors." *Id.* Embark further created the false impression that major colleges and universities, such as Princeton University, had expressed concerns regarding CollegeNET's honesty and integrity. *Id.*

On or about May 26, 2000, a representative from PCDataOnline delivered an email to CollegeNET confirming that the report CollegeNET had generated accurately reflected PCDataOnline's results. *Id.*, ¶ 15. CollegeNET then forwarded this email to Munoz. *Id.* Neither Munoz nor Embark, however, made any effort to correct the false statements. *Id.*, ¶ 16.

CollegeNET believes that Munoz and Embark published Munoz' false statements to representatives from other institutions. *Id.*, ¶ 17. Embark published these false statements with knowledge of the falsity, with reckless disregard for the

truth, and/or without a reasonable belief as to their accuracy. *Id.*, ¶ 18.

The false statements by Munoz and Embark about CollegeNET have *per se* defamed CollegeNET in its business both expressly and by implication. *Id.*, ¶ 19. They have caused harm to CollegeNET's reputation, have potentially caused CollegeNET to lose one or more accounts, and have required CollegeNET to incur expenses to refute these false statements. *Id.* These damages amount to more than $10 million. *Id.*

In addition to using false information in a campaign to discredit CollegeNET, Embark has repeatedly published false and misleading information about itself, beyond mere puffery, in an effort to more effectively compete with CollegeNET. *Id.*, ¶ 26. Such false and misleading assertions include the following: (1) that large numbers of colleges and universities have left CollegeNET for Embark; (2) that Embark holds a 50% market share of the top United States Universities; (3) that Embark's market share is several times that of any competitor; (4) that certain institutions, such as Ohio State University, are among Embark's active admissions application accounts; (5) that its website is the # 1 destination for college bound students; (6) that Embark's website is used by more than 1.7 million individuals every month, and is growing at 300–400% annually; (7) that its website is the most widely used college resource on the world wide web; (8) that Embark processed more than 500,-000 admissions applications in the 1998–99 application season; (9) that "over 10 million people have used Embark.com to find and get into the right school;" (10) that Embark enjoys a 99% retention rate among its clients; and (11) that as of September 24, 1999, 94% of undergraduate institutions were using Embark's admissions services. *Id.*

The above statements, made in press releases, SEC filings, brochures and other communications to the public and customers are false, misleading, and/or incomplete. *Id.*, ¶ 27.

## DISCUSSION

### I. The UTPA as a Consumer Protection Statute

■ Embark first seeks to dismiss the UTPA claim, arguing that: (1) CollegeNET is not a consumer of Embark's products or services; and (2) CollegeNET's claim is based on allegations of personal injury. This court need address only the first of these arguments.

The UTPA itself is silent as to whether it protects only consumers. Rather, it provides that "any *person* who suffers any ascertainable loss of money or property, real or personal, as a result of willful use or employment by a other person of a method, act or practice declared unlawful by ORS 646.608, may bring an individual action." ORS 646.638 (emphasis added). "Person" is defined elsewhere in the UTPA as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated association, and any other legal entity except bodies of officers acting under statutory authority of this state or the United States." ORS 646.605(4).

Neither the parties nor the court have been able to find any Oregon cases addressing whether the UTPA protects only consumers. Therefore, CollegeNET argues that this court must follow the plain language of the statute and find that any "person," whether a consumer or not, may bring a UTPA claim. In order to determine this question of statutory interpretation, this court applies the methodology set out in *PGE v. Bureau of Labor & Indus.*, 317 Or. 606, 859 P.2d 1143 (1993), and will first examine the text and statutory con-

text of the statute. *Id.* at 610–12, 859 P.2d at 1145–46. If, after that examination, the meaning of that phrase is ambiguous, this court may refer to legislative history. *Id.*

CollegeNET argues that in addition to the plain language of ORS 646.638, the UTPA contains other provisions indicating that competitors are covered under the statute. For example:

> A person engages in an unlawful practice when in the course of the person's business ... the person does any of the following:
>
> (h) Disparages the real estate, goods, services, property or business of a customer *or another* by false or misleading representations of fact.

ORS 646.608(1)(h) (emphasis added)

The use of "or another" indicates that the statute is aimed at protecting other businesses as well as consumers. However, even if "another" means someone other than a customer, ORS 646.638 defines who is able to bring suit. Thus, ORS 646.608(1)(h) is not particularly helpful to the analysis.

CollegeNET also points to ORS 646.608(1)(b) which describes a UTPA violation when a person "causes likelihood of confusion ... as to the source, sponsorship, approval, or certification of real estate, goods or services." This provision could logically be invoked by a competitor. However, it also could be invoked by a consumer intentionally confused as to the source or certification of real estate, goods, or a services.

After examining the text and statutory context of ORS 646.638, this court determines that the statute's use of the word "person" is ambiguous. It could reasonably be interpreted to include only those persons who have purchased or contracted for goods or services. *See Koitzsch v. Liberty Northwest Ins. Corp.*, 125 Or.App. 666, 669, 866 P.2d 514, 515 (1994) (a statute is ambiguous if it is "capable of more

than one reasonable interpretation"). Therefore, this court turns to legislative history to ascertain the legislative intent.

Courts interpreting the UTPA have almost uniformly recognized that it is first and foremost a consumer protection statute. The "UTPA is to be construed consistently with its consumer protective purposes." *Cullen v. Investment Strategies, Inc.*, 139 Or.App. 119, 911 P.2d 936, 941, *rev denied* 323 Or. 265, 918 P.2d 846 (1996); *Hinds v. Paul's Auto Werkstatt, Inc.*, 107 Or.App. 63, 65, 810 P.2d 874, 875 (1991) (UTPA intended to provide "broad remedial consumer protection"); *see also Raudebaugh v. Action Pest Control*, 59 Or.App. 166, 171, 650 P.2d 1006, 1009 (1982) (explaining that the purpose of the UTPA is to "provide a viable remedy for consumers" and if "there is an ascertainable loss to a consumer, that consumer has a cause of action" under the UTPA). Several times, courts have specifically referred to the legislative history behind the UTPA. For example, the Oregon Supreme Court explained:

> The language of ORS 646.608(1)(a)-(j) (part of the list of practices declared unlawful) is largely borrowed from the Uniform Deceptive Trade Practices Act. *See* 7 U.L.A. 333 et seq., § 2. The Uniform Act isolates as illegal specific actions of trade symbol or dress infringement, deceptive advertising and false disparagement. Its emphasis is largely in identifying business conduct which is in unfair competition with other businesses ....
>
> On the other hand, the legislative history of the Oregon Unlawful Trade Practices Act supports the view that it is to be interpreted liberally as a protection to consumers. House Bill 3037, the final version of the legislation, combined several bills introduced for consumer protection. Senate Bill 50 (one of the con-

sumer protection bills introduced in the 1971 legislative session) contained much of the language eventually enacted as ORS 646.608(1)(a)-(j). As originally drafted, the bill described the proscribed trade practices as "unfair methods of competition."

However, this language was deleted from the final version. The minutes of the Senate Consumer Affairs Committee for February 17, 1971, read: "Senator Willner then proceeded to explain his amendments to the committee, giving the rationale behind the amendments as he progressed."

"In section 3, he pointed out, the language 'unfair methods of competition' had been deleted, since the bill seeks to protect consumers rather than businesses."

House Bill 3037 contained other "consumer protection" measures (abolition of holder in due course doctrine for consumer transactions; anti-deficiency judgment statute; regulation of home solicitation sales). See Or. Laws, ch. 744 (1971). Because the policy underpinnings of our statute (protection of consumers) differ somewhat from the Uniform Act (protection of businesses), interpretations of the Uniform Act are of limited value in discerning the legislative intent behind the Oregon Act.

*Denson v. Ron Tonkin Gran Turismo, Inc.*, 279 Or. 85, 90, 566 P.2d 1177, 1179 n. 4 (1977).

More recently, the Oregon Court of Appeals noted that:

The legislative history shows that the intent of the amendment was to protect the unwary consumer. Michael Gillette, then chief counsel of the Consumer Protection Division of the Attorney General's office, explained the need for the amending phrase "and includes franchises, distributorships and other similar business opportunities" in testimony be-

fore the House Committee of State and Federal Affairs:

"With respect to franchises and distributorships, our experience with the fairly well-known program known as Dare to Be Great brought to our attention an unexpected flaw in the present Unlawful Trade Practices Act." That flaw exists where there are fraudulent solicitations of unwary and inexperienced citizens to become distributors and where the goods received [to be distributed were] purchased from their vendor, are not to be used, as the language of the statute now is, for personal, family or household purposes but rather are to be held by them for resale. If they're to be held by them for resale [then] the fraudulent misrepresentations that are used by the parent company are not subject to action by our division. "Now, again, the victims of these kinds of schemes are exactly the same kind of victim that the Act is concerned about but they're excluded from our protection simply because they were victimized into trying to become merchants rather than victimized into trying to buy something which they were going to use in their own house." House Committee on State and Federal Affairs, March 23, 1973, Tape 13, Side 1 at 166.

*Lund v. Arbonne Int'l, Inc.*, 132 Or.App. 87, 93 n. 7, 887 P.2d 817, 822 n. 7 (1994).

Based on these cases, this court has little difficulty in concluding that the UTPA provides a cause of action only for consumers. Judge Marsh made this same decision not long ago, stating that "[p]laintiffs have not alleged that they are consumers of defendants' products and thus, I find that they lack standing to maintain claims under the Oregon UTPA." *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 17 F Supp 2d 1170, 1180 (D.Or.1998), *aff'd* 185

F.3d 957 (9th Cir.1999), *cert denied,* 528 U.S. 1075, 120 S.Ct. 789, 145 L.Ed.2d 666 (2000).[2] He specifically noted that:

> Plaintiffs rely upon *Goodyear Tire & Rubber Co v. Tualatin Tire & Auto, Inc.,* ... for the proposition that a plaintiff need not be a "consumer" to maintain an action under the UTPA. *Goodyear* involved an action by a franchisee against a franchisor and the issue was whether a corporation could ever maintain an action under the Act. The court held that the franchisee was a "person" under the Act and could maintain a claim. However, the franchisee was a consumer of the franchisor's products and services. Thus, my ruling is not based upon the facts that plaintiffs are entities rather than individuals, but is instead based upon the fact that plaintiffs have not alleged that they are in any manner "consumers" of defendants' products.

*Id.* at 1180 n. 9.

CollegeNET does not allege that it is a consumer of Embark's products or services. Instead, it is a business that sells services to various colleges and students. Thus, its claim under the UTPA should be dismissed. Instead, CollegeNET's remedy to recover damages to its business allegedly caused by Embark lies with its unfair competition claim.

## II. *Punitive Damages*

■ Article I, § 8, of the Oregon Constitution precludes the imposition of civil punishment, including punitive damages, for speech. Therefore, Embark moves to strike CollegeNET's claim for $30 million in punitive damages on its unfair competition and UTPA claims because these tort claims involve speech. Because the UTPA claim should be dismissed, at issue is only the claim for punitive damages on the unfair competition claim.

Article I, § 8, of the Oregon constitution provides that: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right." In *Wheeler v. Green,* 286 Or. 99, 118, 593 P.2d 777, 789 (1979), the Oregon Supreme Court held that Article I, § 8, prohibits an award of punitive damages for defamation. Subsequently, *Hall v. The May Dept. Stores,* 292 Or. 131, 146–47, 637 P.2d 126, 135–36 (1981), held that Article 1, § 8 also bars punitive damages based on a claim of intentional infliction of emotional distress accomplished through speech. However, punitive damages may be recovered on a claim of intentional infliction of emotional distress accomplished through "non-expressive" conduct. *Lewis v. Oregon Beauty Supply Co.,* 302 Or. 616, 629, 733 P.2d 430, 438 (1987).

Oregon courts have employed this distinction several times. For example, *Wheeler v. Marathon Printing, Inc.,* 157 Or.App. 290, 974 P.2d 207 (1998) explained that "[i]n contrast to [Wheeler and *Hall* ], Marathon's punitive liability was not based on expression .... [T]he gravamen of liability, as framed here, was Marathon's failure to act." *Id.* at 304, 974 P.2d at 215. In *Hinds,* a case almost directly on point,

**2.** In *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,* 185 F.3d 957 (9th Cir.1999), *cert denied,* 528 U.S. 1075, 120 S.Ct. 789, 145 L.Ed.2d 666 (2000), the Ninth Circuit affirmed Judge Marsh's decision disposing of the plaintiffs' UTPA claim because they were not consumers. The Ninth Circuit stated that the UTPA's emphasis on direct protection of consumers "suggests that the UTPA ... is not intended to provide a cause of action to a non-consumer that is wholly derivative of injury to consumers." The Ninth Circuit's language is odd since the plaintiff alleged a direct injury in the form of payments to its insureds, rather than a derivative injury.

the plaintiff brought a UTPA claim based on her purchase of a used 1986 Mazda from the defendant who knew that the car had been in an accident but did not tell the plaintiff. Based on *Wheeler,* the defendant argued that the plaintiff's claim for punitive damages "should not be allowed, because to do so would violate the right of free expression under Article I, section 8, of the Oregon Constitution." *Id.* at 67 n. 5, 810 P.2d at 876 n. 5. The court rejected the defendant's argument, stating that "*Wheeler* holds that punitive damages are unavailable in a case in which the tortious conduct is the communication activity itself. It has no application to this case, in which the misconduct is an improper commercial practice." *Id.*

Here, CollegeNET's allegations do involve defendants' speech, such as "false or misleading representations of fact," "disparagement," and "false and misleading information." Complaint, ¶¶ 21–28. However, the claims seek to impose liability not solely for the false content or nature of the speech, as in a claim for defamation, but for the larger course of an improper commercial practice that encompasses the allegedly false or misleading speech. CollegeNET alleges that Embark is liable because it used false statements to unfairly compete. Therefore, the "gravamen" of such a claim is conduct, not speech. As *Hinds* stated, the Oregon Constitution does not bar punitive damages for unfair competition which is predicated on improper commercial practices, not on speech itself. Just as the plaintiff in *Hinds* sold a product through a material nondisclosure, Embark allegedly has sold its services through material misrepresentations. The fact that Embark's alleged misrepresentations constitute active speech, as opposed to *Hinds'* passive or silent speech of nondisclosure, is a distinction without a material difference.

That is not to say the Oregon Constitution is completely irrelevant. As explained in *Smallwood v. Fisk,* 146 Or.App. 695, 699, 934 P.2d 557, 559 (1997), the Oregon Supreme Court has developed a "decisional template" for "examining the issue of whether punitive damages may be awarded for certain tortious conduct that implicates speech." *Id.* at 699, 934 P.2d at 559, citing *Huffman & Wright Logging Co. v. Wade,* 317 Or. 445, 857 P.2d 101 (1993). If a tort permits liability for speech-caused harm, then a defendant is entitled to a jury instruction limiting the tortious predicate for punitive damages to conduct not protected by the free speech provision of the Oregon Constitution. *Id.* at 457, 857 P.2d at 111. If a tort permits liability for harm not caused by speech, but the defendant contends that the Oregon Constitution prohibits an award of punitive damages for the particular conduct involved, then a defendant likewise may request a limiting instruction. *Id.*

Because the common law tort of unfair competition allows recovery for improper commercial practices whether or not connected to speech, Embark certainly would be eligible for a limiting instruction based the Oregon Supreme Court's holding in *Huffman & Wright Logging.* However, Embark's motion to strike the punitive damages claim should be denied. Accordingly, this court need not address CollegeNET's other arguments in opposition to the motion.

### III. *Puffery Allegations*

■ Embark next moves to strike four allegations in paragraph 26 of the Complaint that underlie CollegeNET's Lanham Act claim and parallel claim under Oregon law for unfair competition because those statements are mere puffery and not actionable. These four allegations are: (1) "large numbers of colleges and universities

have left CollegeNET for Embark;" (2) "Embark holds a 50% market share of the top United States universities;" (3) Embark's "website is the #1 destination for college bound students;" and (4) Embark's "website is the most widely used college resource on the world wide web." Complaint, ¶ 26A, B, E, & G.

In order to state a claim under the Lanham Act, the plaintiff must allege that the defendant made a false statement of fact in a commercial advertisement about its own or another's product. 15 USC § 1125(a)(1); *Coastal Abstract Serv. v. First Am. Title*, 173 F.3d 725, 730 (9th Cir.1999). A statement that is mere "puffery" is not actionable under the Lanham Act. *Id.*, citing *Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir.1990). Because Oregon courts follow Lanham Act case law, similar statements also cannot form the basis of an Oregon common law unfair competition claim. *Classic Instruments, Inc., v. VDO–Argo Instruments*, 73 Or. App. 732, 745, 700 P.2d 677, 689, *rev denied* 300 Or. 111, 707 P.2d 583 (1985).

Puffery has been described as "involving outrageous generalized statements, not making specific claims, that are so exaggerated as to preclude reliance by customers." *Perkiss & Liehe, Inc.*, 911 F.2d at 245 (citation omitted); *see also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir.1997) ("Puffing is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable under § 43(a)"). "The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions." *Id.* Generally speaking, a specific and measurable claim, capable of being proved false or "of being reasonably interpreted as a statement of objective fact," is not puffery. *Coastal*

*Abstract Serv.*, 173 F.3d at 731. "When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context." *Southland Sod Farms*, 108 F.3d at 1139 (citations omitted).

The first representation, that "large numbers of colleges and universities have left CollegeNET for Embark," is sufficiently definite to be actionable. While "large numbers" is vague, it is not too vague to be proven false in this case as CollegeNET intends to prove that only one or two colleges or universities have left it for Embark. No reasonable person could construe only one or two colleges to be a "large number." Thus, Embark's motion to strike this allegation should be denied.

The second representation, that "Embark holds a 50% market share of the top United States universities," is not actionable. While the use of "50%" is a concrete number, the phrase "top universities" is too vague. In order to prove falsity, one would need to know which schools are "top universities." To some, this might indicate the top ten universities in the nation, while others might consider a much larger number. There is also the problem of rating a college or university as "top." While various third-parties rank colleges and universities, the parties, let alone customers, would certainly not agree on which ranking system governs.

In *Southland Sod Farms*, the Ninth Circuit found the defendant's statement that its turf required "50% less mowing" specific and measurable enough to be actionable. *Southland Sod Farms*, 108 F.3d at 1145. However, in that case, the defendant's advertisement contained the caveat that the claim was based on "[t]ests conducted by our research farm." *Id.* Here, the alleged statement by Embark has no similar caveat and thus is simply too vague to be actionable and should be stricken.

■ The third representation, that Embark's "website is the #1 destination for college bound students," also is not actionable. The allegation has two flaws. First, nothing defines the phrase "#1 destination." While such a claim could potentially be measured by the number of "hits" to Embark's website, it may also be measured by the number of pages read, time spent on the site, number of inquires for information, number of colleges serviced, and so forth. Second, "college bound students" is necessarily vague. This phrase could encompass any type of student with any degree of interest in attending college. The key difficulty with this statement lies in proving it false because the parties would need to know if those visiting Embark's website were in fact "college bound." Thus, Embark's motion to strike this allegation should be granted.

■ The fourth representation, that Embark's website is "the most widely used college resource on the world wide web," is actionable when taken in context with the representation that "Embark's statement is used by more than 1.7 million individuals every month, and is growing at 300–400% annually." Complaint, ¶ 26F. Read in conjunction, the statements are both capable of being proven false. By providing a specific measure (1.7 million individuals every month), Embark has set forth a way to analyze the truthfulness of its statement that it is the most widely used college resource on the world wide web. Thus, Embark's motion to strike this allegation should be denied.

## IV. *Damages Under the Lanham Act and Unfair Competition Claims*

■ Lastly, Embark moves to strike ¶¶ 28 and 34 of the Complaint because they allege injuries that are unavailable under the Lanham Act or unfair competition claims. The Complaint alleges injuries based on CollegeNET's theory that "Embark has leveraged its false claims and misleading statements to attract venture and investment capital." *Id.*, ¶ 28. Furthermore, CollegeNET seeks damages for "lost access to investment capital" and "increased financing costs." *Id.*, ¶ 34.

Under 15 USC § 1117(a) [3], the award of monetary remedies in trademark infringement cases includes an award of defendant's profits, any damages sustained by plaintiff, and the costs of the action. *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir.), *cert denied* 510 U.S. 815, 114 S.Ct. 64, 126 L.Ed.2d 34 (1993). Such an award is not automatic, and may be tempered by equitable considerations. *Id.* at 1409. The purpose of § 1117(a) is to

---

**3.** Actions for damages sought under § 43(a) of the Lanham Act are governed by § 35(a) of the Lanham Act, § 15 USC 1117(a), which provides:

(a) When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

remove all the economic incentive from trademark infringement. *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir.1986).

The plain language of § 1117(a) and the case law of this Circuit make clear that courts are vested with considerable discretion in determining the measure of damages for trademark infringement. Embark, however, cites *Cook, Perkiss and Liehe, Inc.*, for the proposition that a plaintiff may only prove damages "by direct diversion of sales ... or by lessening of the good will which its products enjoy with the buying public." *Cook, Perkiss and Liehe, Inc.*, 911 F.2d 242, 244 (9th Cir.1990). *Cook, Perkiss and Liehe* did not concern damages available under the Lanham Act. Instead, the court merely explained that in order to state a claim for false advertising under § 43(a) of the Lanham Act, a plaintiff must allege injury as a result of direct diversion of sales or by a lessening of good will (amongst other necessary allegations). Certainly, *Cook, Perkiss and Liehe* does not hold that a plaintiff may only collect damages calculated from a direct diversion of sales or loss of good will. Instead, as the Ninth Circuit explained in *Lindy Pen,*

> Other jurisdictions have made a distinction between the elements necessary to establish a legal basis for liability from those required for proof of damages. Although we recognize this distinction, '[n]evertheless, an inability to show actual damages does not alone preclude a recovery under section 1117.' In so holding, we express a distinct preference for those opinions permitting relief based on the totality of the circumstance.

*Lindy Pen Co. Inc.*, 982 F.2d at 1410 (internal citations omitted).

In this case, CollegeNET, at some point, will have to prove damages using a reasonable basis for computation. "The Supreme Court has held that '[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness,' yet, a reasonable basis for computation must exist." *Id.* at 1408, quoting *Eastman Kodak Co. v. Southern Photo Mat. Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927). When seeking damages, "[a] plaintiff must prove both the fact and the amount of damage." *Id.* at 1407. "Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement." *Id.* This court is troubled by how Embark's access to venture and investment capital has damaged CollegeNET, as alleged in paragraph 28. However, Embark may seek a protective order if it believes that CollegeNET's discovery requests are beyond the permissible scope of discovery. CollegeNET then will have to justify its need for such discovery.

Many courts have denied a monetary award in infringement cases when damages are remote and speculative. *Id.* at 1408. At this point, however, it would be premature for this court to limit how CollegeNET may prove its damages.

### RECOMMENDATION

For the reasons stated above, Embark's Motion to Dismiss and Strike (docket # 11) should be GRANTED as to CollegeNET's UTPA claim (Second Claim for Relief) and two of the allegations in the Lanham Act and unfair competition claims (that: "Embark holds a 50% market share of top United States universities" and "Embark's website is the # 1 destination for college bound students" as alleged in ¶ 26B & E of the Complaint). Otherwise, Embark's motion should be DENIED.

### SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due January 9, 2001.

If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, the response is due no later than January 29, 2001. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.